650 P.2d 496

**MIDAS MUFFLER SHOP, Plaintiff-Appellee,**

v.

**Leo ELLISON and Phyllis Ellison, husband and wife, Defendants-Appellants.**

**Leo ELLISON and Phyllis Ellison, Counterclaimants-Appellants,**

v.

**Joseph MECEY and Jane Doe Mecey, husband and wife, dba Midas Muffler Shop, Counterdefendants-Appellees.**

**Leo ELLISON and Phyllis Ellison, husband and wife, Third Party Plaintiffs-Appellants,**

v.

**Donald P. KOEPP and Jane Doe Koepp, husband and wife, dba Kiva Collections; and Merchants Mutual Bonding Company, an Iowa corporation, Third Party Defendants-Appellees.**

No. 1 CA–CIV 5343.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 10, 1982.

Hill & Savoy by John E. Savoy, Phoenix, for Meceys, dba Midas Muffler.

Law Offices of Michael E. St. George, P.C. by Michael E. St. George, Tempe, for defendants-appellants.

Foley, Clark & Nye, P.A. by Richard Q. Nye, Frank P. Willey, Phoenix, for Koepps, Kiva Collection.

## OPINION

BROOKS, Judge.

The decisive question on this appeal is whether certain conduct by a collection agency and the emotional distress resulting therefrom is sufficient to impose liability in an action for intentional infliction of emotional distress. The facts are as follows.

In December of 1976, Leo and Phyllis Ellison had a muffler installed on their pickup truck at a Midas Muffler Shop. The bill was $178.50 and a check for that amount was issued to Midas by Phyllis Ellison. Midas attempted to cash the check but when it was returned for insufficient funds, Midas delivered it to Commercial Accounts Corporation for collection. In January of 1977, the Ellisons were notified by Commercial Accounts that the check had been returned. Immediately thereafter, Leo Ellison went to the office of Commercial Accounts and personally paid the $178.50 in cash. Ellison received a receipt for this transaction, but when he asked to have the check back he was told by Commercial Accounts that they did not have it. Ellison then drove to the Midas Muffler Shop and asked for the check back. After a search, the manager told Ellison that they did not have the check either.

Thereafter, Commercial Accounts forwarded its own check payable to Midas in the sum of $110.10 representing the amount collected from the Ellisons minus its 40 percent collection fee. Midas, however, neglected to credit Ellisons' account as having been paid.

Several months later, Midas desired to change collection agencies and requested the return of all its uncollected accounts from Commercial. Included in the accounts returned by Commercial was the Ellisons' check. The check and other accounts were then sent by Midas to its new collection agency, Kiva Collections.

Unaware that the check had been paid, Kiva began telephoning the Ellisons in November of 1977 in an attempt to secure payment. Six phone calls were made over a three month period and, except for one call taken by Leo Ellison at approximately 9:15 p.m. one evening, all the rest were answered by Phyllis Ellison between 8:00 a.m. and 2:00 p.m. Although the substance of the telephone conversations varied from call to call, Phyllis Ellison testified at trial that the Kiva representative stated at various times and in a vicious and nasty manner that the Ellisons were "no better than lying thieves or sponges" and that Kiva was going to "sue your asses" or "sue the hell out of you." It is undisputed that none of the phone calls were made by Midas Muffler. Phyllis Ellison also testified that the calls upset her and made her cry and that she had difficulty sleeping after some of the calls were made.

A copy of the receipt which Leo Ellison had received from Commercial Accounts was ultimately sent by Ellisons to Kiva as proof of payment of the Midas bill. Kiva then notified Midas of the existence of the receipt but was instructed to continue collection efforts because the receipt was not identifiable on its face as being legitimate and Midas had no record of payment. Thereafter, Midas filed a complaint against the Ellisons alleging an unpaid account, whereupon the Ellisons filed a counterclaim against Midas and a third party complaint against Kiva for intentional infliction of emotional distress. Summary judgment was entered in favor of the Ellisons and against Midas on the original complaint. The remaining matters were tried to a jury which returned a verdict in favor of the Ellisons and against Midas and Kiva awarding $750.00 in compensatory damages and $1,750.00 for punitive damages. Thereafter, both Midas and Kiva moved for judgment notwithstanding the verdict. That motion was granted and this appeal by the Ellisons followed. We affirm.

■ On appeal, the Ellisons argue that it is the duty of the trier of fact to determine whether the conduct complained of was sufficiently outrageous to support a claim of intentional infliction of emotional distress,[1] and that the unanimous verdict demonstrates that a proper determination was made. Additionally, we recognize that when reviewing a judgment notwithstanding the verdict, the evidence should be viewed in the light most favorable to the party against whom the motion was made, and if there is any substantial evidence from which reasonable men could have found the ultimate facts to be such as to sustain the verdict, a motion for judgment notwithstanding the verdict should be denied. *Adroit Supply Company v. Electric Mutual Liability Insurance Company,* 112 Ariz. 385, 542 P.2d 810 (1975); *Hurvitz v. Coburn,* 117 Ariz. 300, 572 P.2d 128 (App. 1977).

■ In an attempt to minimize wasted judicial resources on meritless claims for relief under this tort, however, "it becomes the duty of the court in the first instance, as society's conscience, to determine whether the acts complained of can be considered as extreme and outrageous conduct in order to state a claim for relief." *Cluff v. Farmers Insurance Exchange,* 10 Ariz. App. 560, 562, 460 P.2d 666, 668 (1969). "[I]t is for the court to determine whether on the evidence severe emotional distress can be found." *Venerias v. Johnson, supra.* 127 Ariz. at 500, 622 P.2d at 59. Accordingly, the court is required to make an initial determination of the sufficiency of the plaintiff's case. *Davis v. First National Bank of Arizona,* 124 Ariz. 458, 605 P.2d 37 (App. 1979); *Jackson v. Peoples Federal Credit Union,* 25 Wash. App. 81, 604 P.2d 1025 (1979); *Dawson v. Associates Financial Services Company of Kansas, Inc.,* 215 Kan. 814, 529 P.2d 104 (1974); Restatement (Second) of Torts, § 46 Comment h (1965).

■ Arizona has accepted the test for intentional infliction of emotional distress as set forth in the Restatement (Second) of Torts, § 46 (1965). *Savage v. Boies,* 77 Ariz. 355, 272 P.2d 349 (1954); *Davis v. First National Bank of Arizona, supra; Cluff v. Farmers Insurance Exchange, supra.* The Restatement § 46 states in pertinent part:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Although both parties have cited cases from this jurisdiction which have considered intentional infliction of emotional distress, that tort as it relates to the debtor-creditor situation appears to be a question of first impression in Arizona. Also, because the terms "outrageous conduct" and "severe emotional distress" are not capable of precise legal definition, it follows that a case by case analysis is required. Therefore, an examination of decisions from other jurisdictions which have considered the precise question before us is instructive.

■ At the outset, it is necessary to recognize that a proper determination of the issue here presented involves a balancing of the interests of a creditor in collecting a debt against the interest of the debtor to be free from the infliction of severe emotional distress or the unreasonable invasion of privacy. "We must be certain that the outrage theory will not emasculate legitimate creditor remedies on the one hand, or open the floodgates of litigation on the other." *Jackson v. Peoples Federal Credit Union, supra,* 604 P.2d at 1028. Therefore, the courts have uniformly insisted that the creditor's conduct be clearly and obviously excessive in order to sustain a cause of action; "liability usually has rested on a prolonged course of hounding by a variety of extreme methods." W. Prosser, *The*

---

1. There are four elements which must coincide to impose liability for intentional infliction of emotional distress: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress, and (4) The emotional distress must be severe. *Venerias v. Johnson,* 127 Ariz. 496, 499, 622 P.2d 55, 58 (App. 1980).

*Law of Torts* § 12 at 57 (4th ed. 1971). For example, in *Watson v. Franklin Finance,* 540 S.W.2d 186 (Mo. App. 1976), it was alleged that during a 16 month period, the creditor repeatedly wrote, phoned, and visited the debtor, threatening to seize the debtor's home and sell it if payment on the debt was not made. The court determined that a cause of action for emotional distress had been stated.

Similarly, in *Moore v. Savage,* 359 S.W.2d 95 (Tex. Civ. App. 1962), the evidence showed that loan company employees called the plaintiff's business, a pre-school nursery, 15 times per day for three months. Personal visits were made to plaintiff's business where demand for payment was made, and the phone calls to the nursery stopped only when plaintiff complained to the police. The court upheld a jury verdict in plaintiff's favor for emotional distress.

Stressing the long duration of the creditor's course of conduct and the volume of the threatening letters and bills, the court in *Moorehead v. J.C. Penney Company, Inc.,* 555 S.W.2d 713 (Tenn. 1977) held that a claim for emotional distress had been stated where it was alleged that even though plaintiffs had notified defendants of an error in billing, the defendant repeatedly made telephone calls and sent approximately 42 threatening letters over a period of more than one year, and that during the course of this conduct defendant threatened to deliberately injure the plaintiffs' credit reputation and job security.

Other analogous decisions can be found in the debtor-creditor context where the tort involved was invasion of the debtor's right of privacy. The similarity between intentional infliction of emotional distress and invasion of privacy has been recognized. *See Davis v. First National Bank of Arizona, supra.* "Protection against unreasonable invasion of privacy is also the main consideration where the tort of outrage is asserted against a creditor for his debt collection activities." *Jackson v. Peoples Federal Credit Union, supra,* 604 P.2d at 1028. A good example of such unreasonable creditor conduct is found in *Housh v. Peth,* 99

Ohio App. at 485, 135 N.E.2d 440 (1955), *aff'd* 165 Ohio St. 35, 133 N.E.2d 340 (1956). In that case, numerous calls were made by the debt collector every day for a three week period, some of which were late at night. Calls were also made to plaintiff's superiors at the school where plaintiff was employed such that at one time plaintiff was called from her classroom three times within 15 minutes. The calls threatened loss of employment and the repeated nature of the calls caused plaintiff to lose a roomer at her boarding house. The court determined that there was sufficient evidence to support plaintiff's judgment obtained in an action for invasion of privacy. *See also Norris v. Moskin Stores, Inc.,* 272 Ala. 174, 132 So.2d 321 (1961) and cases collected therein which have examined debtor harassment within the context of invasion of privacy.

■ A careful review of the pertinent decisions persuades us that the conduct here involved was not so extreme and outrageous as to permit recovery. Certainly six phone calls by Kiva over a period of three months cannot be considered excessive nor can we say that the language used by Kiva's employees was so atrocious as to be utterly intolerable in a civilized community.

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

Restatement (Second) of Torts § 46 Comment d (1965). As stated in *Slocum v. Food Fair Stores of Florida,* 100 So.2d 396, 398 (Fla. 1958), "[t]here is no inclination to include all instances of mere vulgarities, obviously intended as meaningless abusive expressions."

Furthermore, we find lacking in this particular factual situation a second element required for intentional infliction of emotional distress. The courts have also uni-

formly insisted that the emotional distress suffered be *severe.* "[A] line of demarcation should be drawn between conduct likely to cause mere 'emotional distress' and that causing 'severe emotional distress'...." *Slocum v. Food Fair Stores of Florida, supra,* 100 So.2d at 397; *Jackson v. Peoples Federal Credit Union, supra;* Restatement (Second) of Torts § 46 Comment j (1965). Examples of emotional distress considered severe by the courts are as follows: *Moore v. Savage, supra,* (plaintiff suffered heart attack and nervous exhaustion); *Kirby v. Jules Chain Stores Corporation,* 210 N.C. 808, 188 S.E. 625 (1936) (fright caused by collecting agent's conduct resulted in premature birth of dead baby); *Lyons v. Zale Jewelry Company,* 246 Miss. 139, 150 So.2d 154 (1963) (conduct caused plaintiff to be found writhing in bed in a state of extreme shock and hysteria. She suffered severe nervousness and headaches resulting in such a breakdown of her physical and emotional well being that she was unable thereafter to perform her job.); *Turman v. Central Billing Bureau, Inc.,* 279 Or. 443, 568 P.2d 1382 (1977) (plaintiff suffered severe headaches and stress and her state of anxiety ultimately required hospitalization); *Dawson v. Associates Financial Services Company of Kansas, Inc., supra,* (telephone calls to plaintiff who suffered from multiple sclerosis caused stress and a relapse resulting in a permanent impairment of her condition). Other illustrative decisions can be found at 87 A.L.R.3d 201; Greenfield, *Coercive Collection Tactics—An Analysis of the Interests and the Remedies,* 1972 Wash. U.L.Q. 1; Prosser, *Insult and Outrage* 44 Cal. L. Rev. 40 (1956).

At the trial in the case before us, Phyllis Ellison testified that the telephone calls upset her and made her cry, and that she had difficulty sleeping on several occasions after the calls were made. We cannot say that the emotional distress here involved was sufficiently severe to warrant the imposition of liability for intentional infliction of emotional distress. "It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people." Restatement (Second) of Torts § 46 Comment j (1965).

We find that the conduct complained of and the emotional distress resulting therefrom were not sufficient as a matter of law to sustain a claim for intentional infliction of emotional distress. The judgment of the trial court is thereby affirmed.

■ We next consider appellee Midas Muffler's contention that this appeal with respect to Midas is frivolous, and that we should impose sanctions on appellants and their attorney pursuant to Rule 25, Rules of Civil Appellate Procedure, 17A A.R.S. As is pointed out by Midas in its answering brief, in the absence of special circumstances a collection agency is an independent contractor with respect to the creditor whose claim is sought to be collected by the agency. Therefore, under the general principles applicable to independent contractors, the creditor is not responsible for the torts of the collection agency or its employees. *See* 15A Am. Jur. 2d *Collection and Credit Agencies,* § 2 (1976). In the opening brief, counsel for appellants makes absolutely no attempt whatsoever to show why Midas should be liable for the collection methods of Kiva. In the argument section of the opening brief, Midas' alleged liability is asserted only in a conclusionary fashion, such as the following:

> The allegations of the complaint and the evidence presented to the trier of fact were sufficient for the jury to determine whether the conduct of Kiva Collections and Midas Muffler was extreme and outrageous.

Counsel for appellants did not even file a reply brief to rebut the points urged in Midas' answering brief. Assuming arguendo that counsel's clients insisted that an appeal be taken against Midas as well as Kiva, counsel's attempt to show liability on behalf of Midas did not even come close. Frivolous appeal damages in the amount of $500.00 are therefore awarded against coun-

sel for appellants, Michael St. George, and in favor of Midas Muffler Shop.[2]

JACOBSON and GRANT, JJ., concur.

---

**2.** Rule 25. Sanctions for Delay or Other Infractions

Where the appeal is frivolous or taken solely for the purpose of delay, or where a motion is frivolous or filed solely for the purpose of delay, or where any party has been guilty of an unreasonable infraction of these rules, the ap- pellate court may impose *upon the offending attorneys* or parties such reasonable penalties or damages (including contempt, withholding or imposing of costs, or imposing of attorney's fees) as the circumstances of the case and the discouragement of like conduct in the future may require. (Emphasis added.)