716 P.2d 1022

Janet L. LUCCHESI, the surviving mother of Jeremy Michael Lucchesi, deceased, on her own behalf and for and on behalf of David Lucchesi, the surviving father of Jeremy Michael Lucchesi; Janet L. Lucchesi and David Lucchesi, wife and husband, Plaintiffs-Appellants,

v.

FREDERIC N. STIMMELL, M.D., LTD., an Arizona corporation; and Frederic N. Stimmell, Defendants-Appellees.

Janet L. LUCCHESI, the surviving mother of Jeremy Michael Lucchesi, deceased, on her own behalf and for and on behalf of David Lucchesi, the surviving father of Jeremy Michael Lucchesi; Janet L. Lucchesi and David Lucchesi, wife and husband, Plaintiffs-Appellants,

v.

SAMARITAN HEALTH SERVICE, INC., an Arizona corporation; dba Good Samaritan Hospital, Defendant-Appellee.

Nos. 1 CA–CIV 6366, 1 CA–CIV 6623.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 13, 1985.

Leonard & Clancy, P.C. by Kenneth P. Clancy, James J. Leonard, Jr., Phoenix, for plaintiffs-appellants.

Weyl, Guyer, MacBan & Olson by Thomas G. Bakker, Duane A. Olson, Phoenix, for defendants-appellees.

Teilborg, Sanders & Parks, P.C. by Frank A. Parks, Donald L. Myles, Jr., Phoenix, for defendant-appellee Samaritan Health Service.

## OPINION

BROOKS, Judge.

Plaintiffs-appellants, Janet and David Lucchesi, filed a multi-count complaint against Samaritan Health Service, Inc. (Samaritan) and Frederic Stimmell, M.D., seeking damages arising out of the delivery of appellants' stillborn child and the treatment administered to Mrs. Lucchesi immediately thereafter. Count one of the complaint alleged that the negligence of each of the defendants resulted in the wrongful death of the unborn fetus. Count two sought damages from each of the defendants by reason of Mrs. Lucche-

si's failure to receive a "RhoGAM injection". Count three of the complaint sought damages for intentional infliction of emotional distress against Dr. Stimmell only. The trial court granted partial summary judgment in favor of Dr. Stimmell on counts one and three, but denied his motion for summary judgment on count two. The trial court entered a final judgment incorporating the necessary language from Rule 54(b), Arizona Rules of Civil Procedure, and the Lucchesis appealed to this court. Subsequently, the trial court granted Samaritan's motion for summary judgment on all counts and entered a final judgment which the Lucchesis also appealed to this court. The two appeals were thereafter consolidated.[1] Two issues are presented for review by this court:

1. Whether the evidence supports an inference that Mrs. Lucchesi's failure to receive a RhoGAM injection resulted from a breach of duty on the part of Samaritan;

2. Whether the evidence is legally sufficient to support appellants' claim against Dr. Stimmell for intentional infliction of emotional distress.

## FACTS

Janet Lucchesi was pregnant with her first child. Dr. Wilson Shill had been providing her prenatal care. She went into labor when the fetus was approximately 24 weeks into gestation (normal gestation is 40 weeks). Dr. Shill examined her at Desert Samaritan Hospital at 2:00 a.m. on the day in question and determined that the physicians at Good Samaritan Hospital were better equipped to handle her high risk pregnancy and the imminent delivery. Dr. Stimmell, a staff member of Good Samaritan's perinatal program, discussed the situation with Dr. Shill by telephone. Both doctors agreed that there was only a small chance of saving the fetus. Mrs. Lucchesi was transported to Good Samaritan at approximately 5:45 a.m.

Dr. Stimmell's normal practice was to wait at home until the hospital's labor and

---

**1.** Appellants concede that the trial court correctly granted summary judgment on the claim for

wrongful death (Count one) and that matter is not before this court.

delivery staff notified him of the patient's condition on admission. After the notification in this case, Dr. Stimmell believed that the premature fetus' chance of survival would be improved by facilitating immediate delivery. He was not personally present at the delivery.

Drs. Mac Whitford and Scott Partridge, residents in the Good Samaritan program, attended Mrs. Lucchesi. They found that the fetus was in the "double footing breach" position, in which the head of the fetus is the last to exit the mother. Attempts to deliver the child by pulling on its hip area to free the head resulted in decapitation.

Dr. Stimmell arrived at the hospital between 8:00 and 9:00 a.m. and ordered a "type and screen" of Mrs. Lucchesi's blood. These test results, which did not appear on Mrs. Lucchesi's chart until after she was discharged from the hospital, indicated her blood type to be "Rh negative". At no time during her hospitalization was she administered a RhoGAM injection.[2] Because of her failure to receive this injection, Mrs. Lucchesi was required to undergo antibody screens and other medical tests in order to determine her ability with respect to future child bearing.

Dr. Stimmell spoke with Mrs. Lucchesi shortly after her child was stillborn, but did not inform her of the specific details of the traumatic delivery. She did not learn of the decapitation until she was later investigating her failure to receive the RhoGAM injection, at which time Dr. Shill advised her of the specific circumstances surrounding the attempted delivery of her child.

Other facts will be presented as they may become pertinent to the legal analysis.

## FAILURE TO ADMINISTER A RHOGAM INJECTION

The Lucchesis characterize the first issue as whether Samaritan has a duty to *assure*

that a patient with an Rh-negative factor is administered a RhoGAM injection prior to leaving the hospital after delivery. Samaritan, on the other hand, narrowly construes the issue as whether it had a duty to *order* that a RhoGAM injection be given. All parties concede that no RhoGAM injection was given to Mrs. Lucchesi. Dr. Stimmell concedes responsibility for the failure to administer the injection. The Lucchesis argue, however, that Dr. Stimmell's testimony indicates that a concurrent duty rested with the hospital.

In his deposition, Dr. Stimmell testified that his routine was to order a "type and screen" and to review whether the patient was Rh negative. If so, the RhoGAM injection would be administered as part of the final check-out which is handled by the hospital nursing staff. Dr. Stimmell testified to a system of "checks and balances" between attending physicians and the hospital staff to assure that a RhoGAM injection is given when needed. He further testified that he is "ultimately responsible" for seeing that the patient's Rh status is on the hospital chart and for responding to the situation in an appropriate fashion. His testimony included, in part, the following:

*We have several checks, balances, etc., all of which failed. Probably six different steps along the way, which we usually use to pick [the patient's Rh status] up, all failed [sic].* (Emphasis added.)

\* \* \* \* \* \*

Q. I don't understand what you mean when you say we have several checks and balances along the way. What are they, to try and avoid missing this problem?

A. Well, in the first place, she arrived at the hospital with a note, with information, and this piece of information was

---

**2.** RhoGAM is a drug which suppresses the immune response which Rh negative mothers may develop to Rh positive blood. Failure to administer the drug increases the risk of the immune response and the consequent risk to subsequent

pregnancy by approximately ten times. To be effective, the drug must be administered within seventy-two hours after delivery of an infant with Rh positive blood.

not on there. Ordinarily it is. Had it been there day one, when she came in, had it been Rh-negative, it would have been picked up then. Ordinarily, if the case were not as it were, she would have then gotten my routine post-partum orders and specifically, it would have stated to check it and to give medication and that she did not get because, also, of special circumstances. The orders were written by the resident and the order to draw the blood was written but there was not an order following that to give her medication, but this is the second place that it got policed.

The third place was that she did not go to a standard obstetrical floor ... her room in the hospital was on a non-obstetrical floor, so the nursing staff there is not nearly as acutely aware of this particular problem as they would be on the obstetrical floor.

Q. On the ob floor, are the nurses specifically instructed to be alert to this problem and if they see a lab slip come back Rh-negative, they sort of cross-check?

A. They would be much more sensitive to it. This is something they would deal with daily. They would be aware of it and it is one of the secondary checks you see because they would be aware of this.

    \*    \*    \*    \*    \*    \*

But from the nursing floor she was on, you would not expect them to be aware of this as acutely.

The fourth item that occurred was that by virtue of timing, she, and the holiday, she got her blood drawn not on the day she went to the floor because she got there too late for the usual blood drawing rounds. It got put into the routine hopper, blood was drawn the following morning, which meant that the results were not on the chart and not back from the lab at the time of her discharge. Now, again, when the results did come out, the patient had then been discharged. There was no mechanism in the lab, etc., at that time or on the floor to alert anyone to the fact that this may

need some follow-up, you see, which could have been done also. ... The lab slip was not there and so it escaped me. I could have held the patient in the hospital until such time as the laboratory was done running their studies, etc., and we had that answer and then, you know, let her go.

The Lucchesis contend that the hospital's motion for summary judgment should have been denied because Dr. Stimmell's testimony creates factual issues relating to the hospital's duty and breach thereof. The Lucchesis argue that the hospital had a duty to assure that the emergent nature of the situation was brought to the laboratory's attention so that the holiday weekend would not have interfered with the timely reporting of the blood tests. Further, the resident (a medical doctor) who wrote the initial orders for Mrs. Lucchesi should have included an order to follow up on the "type and screen" and to provide medication if warranted. Also, the nursing staff should have noted that the laboratory slip was not reported regarding this patient and the nurses should have consulted with the laboratory regarding its findings prior to Mrs. Lucchesi's discharge.

■ Although Dr. Stimmell's testimony is somewhat lacking as to the hospital's standard of care, we find that it is sufficient to create factual issues relating to the hospital's duty. In that regard, we must weigh the evidence and consider all of the matters presented in the light most favorable to the party opposing the motion for summary judgment. *Hall v. Motorists Insurance Corp.*, 109 Ariz. 334, 509 P.2d 604 (1973).

■ Samaritan next argues that Dr. Stimmell's testimony does not establish that the hospital deviated from the standard of care. It contends that since Dr. Stimmell conceded that the responsibility and duty of ordering the RhoGAM injection was his, Samaritan cannot be responsible for that omission. We disagree. Dr. Stimmell's testimony indicates that the hospital staff failed to include on Mrs. Lucchesi's

chart the lab slip with her blood type. Also, Mrs. Lucchesi, who had experienced a high risk pregnancy and who was transferred to Good Samaritan Hospital for specialized care, was placed on a non-obstetrical floor where the nursing staff was not as acutely aware of the particular problems as the nursing staff would have been on the obstetrical floor. Finally, Dr. Stimmell's deposition indicates that the test results of Mrs. Lucchesi's blood were delayed because the incident occurred over a holiday week-end, and that this delay contributed to the failure to administer a RhoGAM injection. This testimony is sufficient to infer a duty for purposes of establishing a *prima facie* case so as to preclude summary judgment and is sufficient to raise questions of fact regarding breach of that duty.

■ Samaritan argues that even if it was under a duty and that duty was breached, the vital element of proximate cause is absent because Dr. Stimmell, in his deposition, admits ultimate responsibility for seeing that Mrs. Lucchesi received a RhoGAM injection. Samaritan contends that Dr. Stimmell never contended in his deposition, nor does the record otherwise support a conclusion, that Samaritan's acts in any way caused Mrs. Lucchesi's failure to receive a RhoGAM injection. We disagree. Taking all reasonable inferences in the light most favorable to the Lucchesis, we conclude that Dr. Stimmell's testimony is sufficient to present a question of fact in regard to proximate cause which precludes summary judgment. Joint and several liability may be imposed upon two or more tortfeasors, notwithstanding that their tortious conduct is independent rather than joint. *Fredericks v. Thunderbird Bank*, 118 Ariz. 165, 167, 575 P.2d 364, 366 (App. 1978). There may be more than one proximate cause of an injury if each was an efficient cause without which the resulting injuries would not have occurred. *McDowell v. Davis*, 104 Ariz. 69, 448 P.2d 869 (1968). Although it is essential to joint liability that both operators are negligent, the parties may be sued jointly although the degree of care which each owed the person injured was different. They may be sued jointly, notwithstanding that there may exist a difference in the degree of liability or the quantum of evidence necessary to establish such liability. *Curlee v. Morris*, 72 Ariz. 125, 128, 231 P.2d 752, 753–54 (1951).

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT A CLAIM AGAINST DR. STIMMELL FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Lucchesis argue that Dr. Stimmell's failure to attend the delivery, and his failure to disclose the traumatic nature of the delivery, constitute intentional infliction of emotional distress. The Lucchesis contend that the special relationship which exists between a physician and a patient, and Mrs. Lucchesi's particular susceptibility to distress given the medical circumstances which precipitated the physician-patient relationship, are factors which must be considered. *See Christofferson v. Church of Scientology*, 57 Or.App. 203, 644 P.2d 577, 583 (1982). The Lucchesis argue that the facts here clearly present the necessary combination of factors to establish a *prima facie* case and thus mandate denial of Dr. Stimmell's motion for summary judgment on the emotional distress claim.

The Restatement (Second) of Torts § 46 (1965) states in pertinent part:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

The elements of outrage are:

1. The conduct must be intentional or reckless;

2. The conduct must be extreme and outrageous;

3. There must be a causal connection between the wrongful conduct and the emotional distress; and,

4. The emotional distress must be severe.

*Venerias v. Johnson,* 127 Ariz. 496, 622 P.2d 55 (App.1980).

■ In Arizona, the court in the first instance has the duty to determine whether the. acts complained of can be considered extreme and outrageous conduct so as to state a claim for relief. *Midas Muffler v. Ellison,* 133 Ariz. 194, 650 P.2d 496 (App. 1982); *Cluff v. Farmers Insurance Exchange,* 10 Ariz.App. 560, 460 P.2d 666, 39 A.L.R.3d 731 (1969). The court must determine whether, on the evidence, severe emotional distress can be found. *Venerias v. Johnson,* 127 Ariz. 496, 622 P.2d 55 (App. 1980); *Restatement (Second) of Torts* § 46, comment h (1965).

The Lucchesis cite cases from other jurisdictions which have analyzed acts alleged to constitute outrageous conduct. In *Grimsby v. Samson,* 85 Wash.2d 52, 530 P.2d 291, 77 A.L.R.3d 436 (1975), the court found an allegation that a physician abandoned his patient sufficient to withstand a motion to dismiss the complaint. In *Rockhill v. Pollard,* 259 Or. 54, 485 P.2d 28 (1971), the court found that evidence of a physician's cursory examination combined with rudeness and requiring the patient and her unconscious baby to wait outside in the cold was sufficient to withstand a motion for a directed verdict. These cases emphasize the relationship between the parties as being a factor to consider. The Lucchesis also argue that *Johnson v. Women's Hospital,* 527 S.W.2d 133 (Tenn. App.1975) is analogous. In *Johnson,* a premature infant died immediately after birth. The hospital kept the infant's body as a surgical specimen without ever advising the parents. The hospital's outrageous conduct was placing the body of the premature infant in a jar of formaldehyde and displaying the jar to the mother. The case of *Taylor v. Baptist Medical Center,* 400 So.2d 369 (Ala.1981), is also cited. That case involved a factual situation in which the defendant physician failed to arrive for the child's delivery, and no competent physician was present during the labor and delivery process. The Supreme Court of Alabama reversed the summary judgment granted in favor of the physician on negligence and breach of contract claims.

■ The cited cases are distinguishable from the facts of the instant case. Dr. Stimmell testified that his decisions not to attend the delivery and not to inform Mrs. Lucchesi of the fetal decapitation were proper under the circumstances. The record is devoid of any evidence that Dr. Stimmell intended to inflict emotional distress on Mrs. Lucchesi. Nor was his failure to attend the delivery and failure to disclose information reckless. His unrebutted testimony established that he followed steps which, in his professional judgment and given the risks involved, were designed to facilitate delivery of the fetus in a rapid manner and to increase the likelihood of survival of the pre-viable infant. His unrebutted testimony also established that the normal practice of obstetricians is to await a report of the condition of the patient upon her admission to the hospital before leaving home for the delivery. Further, given the tragic situation, one can reasonably infer that immediately revealing the traumatic nature of the delivery to Mrs. Lucchesi, rather than withholding it, could have indeed caused Mrs. Lucchesi severe emotional distress. Dr. Stimmell chose to withhold the information in order to provide as much emotional support to the distressed mother as was possible under the circumstances. The evidence was insufficient to establish a claim of outrage, and the trial court properly granted Dr. Stimmell's motion for summary judgment on this count.

For the foregoing reasons, we reverse the summary judgment as to Samaritan on count two, the claim for physical injury for failure to administer a RhoGAM injection, and affirm the granting of summary judgment in favor of Dr. Stimmell on count three, the claim for intentional infliction of emotional distress. The matter is remanded to the trial court for proceedings consistent with this decision.

HAIRE, P.J., concurs.

GRANT, Judge, concurring in part and dissenting in part.

I concur in that portion of the majority opinion that reverses the summary judgment granted by the trial court in favor of defendant Samaritan Health Service.

I dissent from that portion of the majority opinion that affirms the partial summary judgment granted in favor of Dr. Stimmell on the appellant's claim for intentional or reckless infliction of emotional distress. I believe that reasonable persons could differ as to whether Dr. Stimmell's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.

Arizona accepted the tort of intentional or reckless infliction of emotional distress as part of its jurisprudence in the case of *Savage v. Boies*, 77 Ariz. 355, 272 P.2d 349 (1954). Subsequent decisions such as *Cluff v. Farmers Insurance Exchange*, 10 Ariz. App. 560, 460 P.2d 666 (1969), and *Bendalin v. Valley National Bank*, 24 Ariz.App. 575, 540 P.2d 194 (1975) have acknowledged that this legal theory is of continuing validity and may arise out of varied circumstances. For example this tort has been found to exist within the insurance context, and in commercial transactions. It may also exist in the medical negligence framework. *Grimsby v. Samson*, 85 Wash.2d 52, 530 P.2d 291 (1975); *Rockhill v. Pollard*, 259 Or. 54, 485 P.2d 28 (1971).

The majority bases its affirmance on its statement that "The record is devoid of any evidence that Dr. Stimmell intended to inflict emotional distress on Mrs. Lucchesi." *Ante* at 1027. However there can be no question that Dr. Stimmell intended his actions in not being present at the delivery. The majority goes on to say: "Nor was his failure to attend the delivery and failure to disclose information reckless." *Ante* at 1027. The majority talks about Dr. Stimmell's unrebutted testimony that the normal practice of obstetricians is to await a report of the condition of the patient upon her admission to the hospital before leaving home for the delivery. The majority seems to hold that because, when Mrs. Lucchesi reached Good Samaritan Hospital, Dr.

Stimmell did not have enough time to arrive from his home before the delivery, he is absolved. This ignores other unrefuted facts of the case which are that this was not a normal delivery and that Dr. Stimmell was aware of the unusual circumstances of this delivery. Dr. Stimmell was first called by Mrs. Lucchesi's regular obstetrician, Dr. Wilson Shill, at approximately 5:36 a.m. on the morning of November 22, 1979, Thanksgiving Day. At the time that he was contacted by Dr. Shill, Dr. Stimmell was apprised that, in Dr. Shill's opinion, the delivery was imminent. Both agreed that the minimal chance of saving the baby would be maximized by transporting the mother by ambulance to the perinatal, high-risk program at Good Samaritan Hospital. Dr. Stimmell acknowledged responsibility for the Arizona Perinatal Project on that date. He told Dr. Shill he was in charge of the program and would assume responsibility for the care of Mrs. Lucchesi as he was the physician on call. Mrs. Lucchesi testified that she was told by Dr. Shill that Dr. Stimmel would be waiting for her at Good Samaritan Hospital when she arrived. Mrs. Lucchesi was transported by ambulance to Good Samaritan Hospital where the baby was delivered at 6:30 a.m. on that date. Had Dr. Stimmell left for the hospital upon receiving Dr. Shill's call he would have been present for the delivery, however, he was neither present at the hospital at the time of the delivery nor enroute to the hospital. Dr. Stimmell testified that it was his active and intentional decision not to be present at the hospital although nothing prevented him from being there. In my opinion this evidence was sufficient to establish a claim of intentional or reckless infliction of emotional distress and the case should have been submitted to the jury.

As the majority points out Arizona has followed the *Restatement (Second) of Torts* § 46 (1965) regarding the elements of this tort. Arizona cases have referred to Comment (d) of that section which states as follows:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

See *Bendalin v. Valley National Bank*, 24 Ariz.App. at 577, 540 P.2d at 196.

The majority claims a special standard of review for the tort of intentional or reckless infliction of emotional distress: "In Arizona, the court in the first instance has the duty to determine whether the acts complained of can be considered extreme and outrageous conduct so as to state a claim for relief." *Ante* at 1027. That statement which has evolved into an erroneous standard of review first appears in *Cluff v. Farmers Insurance Exchange*, 10 Ariz.App. at 562, 460 P.2d at 668, which stated:

> Even if the defendant's acts are done "wilfully, intentionally and maliciously" with "intent to inflict mental suffering and emotional distress," it becomes the duty of the court in the first instance, as society's conscience, to determine whether the acts complained of can be considered as extreme and outrageous conduct in order to state a claim for relief. Restatement (Second) Torts Sec. 46, Comment (h) (1965).

This expression omits a critical portion of the comment. Comment (h) in the Restatement, actually reads:

> h. *Court and jury.* It is for the court to determine, in the first instance, whether the defendant's conduct *may reasonably be regarded as* so extreme and outrageous as to permit recovery, or whether it is necessarily so. *Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.*

(emphasis added)

Thus *Cluff* fails to provide any authority for imposing a different standard of review on this tort than on any other tort. Rather, Comment (h) is merely a specific application to this tort of the general rule that matters of law are for the court whereas matters of fact are for the jury. The relevant standard of review in any tort action is as stated in the first section of the majority opinion, "we must weigh the evidence and consider all of the matters presented in the light most favorable to the party opposing the motion for summary judgment. *Hall v. Motorist Insurance Corp.*, 109 Ariz. 334, 509 P.2d 604 (1973)."

With that standard of review in mind, I believe a jury could find the likelihood that the plaintiff would suffer emotional distress upon realizing Dr. Stimmell was not present at the delivery was substantially certain and therefore the defendant either intended this result or was reckless in his conduct knowing that this result was a strong possibility. A jury could find that Dr. Stimmell's deliberate act of not attending the delivery of the plaintiff, who was being sent to him specifically for his needed expertise in view of her complications, was an act which was callous and "utterly intolerable in a civilized community." Because of the unique physician-patient relationship the following statement by Professors Prosser and Keeton is particularly applicable:

> The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position

which gives the defendant actual or apparent power to damage the plaintiff's interests.

Prosser & Keeton, *Law of Torts* § 12 at 61 (5th ed. 1984). The physician/patient relationship may cause actions to be found as outrageous conduct which would otherwise not be. In *Humphers v. First Interstate Bank,* 68 Or.App. 573, 576–77, 684 P.2d 581, 584 (Or.App.1984), *rev'd on other grounds,* 298 Or. 706, 696 P.2d 527 (1985), the court stated:

> Plaintiff's first claim is for outrageous conduct causing severe emotional distress. Outrageous conduct is an intentional tort which requires inflicting actual mental suffering on the plaintiff to be the deliberate purpose of the defendant's conduct (citations omitted). However, the tortious purpose can be found in the breach of some obligation that attaches to a defendant's responsibility toward the plaintiff ... The physician-patient relationship is sufficient to create the duty; and defendant may therefore be liable, even if [Dr.] Mackey did not have as his deliberate purpose inflicting actual mental suffering on plaintiff.

Another basis on which extreme outrage can be found is the defendant's knowledge that the plaintiff is especially sensitive, susceptible and vulnerable to injury through mental distress due to the plaintiff's condition such as pregnancy and impending premature delivery. Prosser & Keeton, *Law of Torts* § 12 at 62–63. In such special relationships and circumstances it should be sufficient for a case to reach the jury if the defendant knew that the mental distress was substantially certain to follow from his intentional conduct or when the mental distress was so highly probable that the defendant's intentional actions in conscious disregard of this probability

could be characterized as willful, wanton or reckless. This tort should encompass conduct not only directly intended to cause mental distress but conduct which is willful, wanton and reckless in its deliberate disregard of a known high degree of risk of such distress. *See, e.g., Johnson v. Woman's Hospital,* 527 S.W.2d 133 (Tenn.App. 1975); *Price v. Yellow Pine Paper Mill Co.,* 240 S.W. 588 (Tex.Civ.App.1922); *Boyle v. Chandler,* 33 Del. 323, 3 W.W. Harr. 323, 138 A. 273 (1927). In this case reasonable persons could differ as to whether the defendant's conduct should result in liability.

In a remarkably similar case the Alabama Supreme Court overturned a summary judgment against a plaintiff who claimed her physician's negligence caused her mental anguish. *Taylor v. Baptist Medical Center, Inc.,* 400 So.2d 369 (Ala. 1981). Where there is sufficient evidence for the question to be submitted to the jury then this court must reverse the summary judgment. *Linsenmeyer v. Hancock,* 23 Ariz.App. 444, 533 P.2d 1181 (1975). As the author of the majority opinion has previously stated the terms "outrageous conduct" and "severe emotional distress" are not capable of precise legal definition, and therefore a case by case analysis is required. *Midas Muffler Shop v. Ellison,* 133 Ariz. 194, 650 P.2d 496 (App.1982).

I am further troubled by another significant point concerning this tort. A review of Arizona cases shows that Arizona courts surreptitiously have attempted to discourage the cause of action of the tort of intentional or reckless infliction of emotional distress. Very few claims for the intentional or reckless infliction of emotional distress reach Arizona juries. Most of these tort claims are disallowed as a matter of law by the Arizona courts.[1] Even in the

---

**1.** Arizona decisions have disallowed jury consideration of this tort in the following ways: (1) dismissal for failure to state a claim; *see Hixon v. State Compensation Fund,* 115 Ariz. 392, 565 P.2d 898 (App.1977); *Cluff v. Farmers Insurance Exchange;* (2) summary judgment; *see Patton v. First Federal Savings & Loan Association,* 118 Ariz. 473, 578 P.2d 152 (1978); *Midas Muffler*

*Shop v. Ellison,* 133 Ariz. 194, 650 P.2d 496 (App.1982); *Davis v. First National Bank of Arizona,* 124 Ariz. 458, 605 P.2d 37 (App.1979); *Joseph, M.D. v. Markovitz, M.D.,* 27 Ariz.App. 122, 551 P.2d 571 (1976); *Bendalin v. Valley National Bank;* (3) directed verdict; *see Thompson v. Sun City Community Hospital, Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984); *Watts v. Golden*

**94**

few Arizona cases where this tort is submitted to the jury and the plaintiff prevails, Arizona appellate courts often reverse the jury verdict.[2]

As previously noted, Arizona recognizes the tort of intentional or reckless infliction of emotional distress as a valid cause of action. *Savage v. Boies.* The trend of current Arizona case law, in part due to the erroneous standard of review utilized in *Cluff,* effectively abrogates this cause of action. In *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961 (1984) the Arizona Supreme Court held that the right to bring a cause of action to recover damages for injury was a "fundamental right" guaranteed under article 18, § 6 of the Arizona Constitution. That constitutional provision states as follows:

> The right of action to recover damages for injury shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

Article 18, § 6 prohibits "abrogation." *Barrio v. San Manuel Division Hospital, Magma Copper,* 143 Ariz. 101, 692 P.2d 280 (1984). Although previous decisions holding provisions void under article 18, § 6 have involved statutory law rather than case law, literally and logically article 18, § 6 applies to both.

I would reverse the summary judgment granted in favor of Dr. Stimmell and remand for trial.

*Age Nursing Home,* 127 Ariz. 255, 619 P.2d 1032 (1980); *Aspell v. American Contract Bridge League, Etc.,* 122 Ariz. 399, 595 P.2d 191 (App. 1979).

2. *See Venerias v. Johnson,* 127 Ariz. 496, 622 P.2d 55 (App.1980).