716 P.2d 1013

Janet L. LUCCHESI, the surviving mother of Jeremy Michael Lucchesi, deceased, on her own behalf and on behalf of David Lucchesi, the surviving father of Jeremy Michael Lucchesi; Janet L. Lucchesi and David Lucchesi, wife and husband, Plaintiffs-Appellants,

v.

FREDERIC N. STIMMELL, M.D., LTD., an Arizona corporation; and Frederic N. Stimmell, Defendants-Appellees.

Janet L. LUCCHESI, the surviving mother of Jeremy Michael Lucchesi, deceased, on her own behalf and for and on behalf of David Lucchesi, the surviving father of Jeremy Michael Lucchesi; Janet L. Lucchesi and David Lucchesi, wife and husband, Plaintiffs-Appellants,

v.

SAMARITAN HEALTH SERVICE, INC., an Arizona corporation, dba Good Samaritan Hospital, Defendant-Appellee.

No. 18368–PR.

Supreme Court of Arizona, En Banc.

March 27, 1986.

Leonard and Clancy, P.C., Phoenix, for plaintiffs-appellants.

Weyl, Guyer, MacBan & Olson by Tamela L. Kahle, Thomas G. Bakker, and Duane A. Olson, Phoenix, for defendant-appellee Stimmell.

Teilborg, Sanders & Parks by Frank A. Parks and Jones, Skelton & Hochuli by Donald L. Myles, Jr., Phoenix, for defendant-appellee Samaritan.

HAYS, Justice.

Plaintiffs-petitioners, Janet and David Lucchesi, filed suit against defendants-re-

spondents, Dr. Frederic N. Stimmell, M.D., and Samaritan Health Service, Inc., in the Maricopa County Superior Court. In their complaint, the Lucchesis claimed damages as a result of the events surrounding the simultaneous birth and decapitation of their child, Jeremy Michael. Count One of the complaint alleged that the negligence of each defendant resulted in the wrongful death of the fetus. Count Two sought damages from each defendant by reason of Mrs. Lucchesi's failure to receive a Rhogam injection after the delivery. Count Three sought damages for intentional or reckless infliction of emotional distress against Dr. Stimmell only.

Following discovery, both defendants moved for summary judgment. The trial court granted Samaritan Health Services' motion as to all claims. It further granted Dr. Stimmell's motion as to the infliction of emotional distress and wrongful death counts, but denied summary judgment with regard to the personal injury claim.

The Court of Appeals reversed the trial court's grant of summary judgment as to Samaritan Health Services, but affirmed the granting of summary judgment in favor of Dr. Stimmell on the claim for intentional infliction of emotional distress (*Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 149 Ariz. 85, 716 P.2d 1022 (1985).

The Lucchesis petitioned this court for review claiming that sufficient evidence existed to create a factual question as to whether Dr. Stimmell's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for intentional or reckless infliction of emotional distress. We accepted review and have jurisdiction pursuant to Ariz. Const. art. 6,

§ 5(3); Rule 23, Rules of Civil Appellate Procedure, 17A A.R.S. We agree with petitioners and, therefore, vacate that portion of the Court of Appeals opinion affirming summary judgment in favor of Dr. Stimmell on Count Three of petitioners' complaint.

The facts follow. On November 22, 1979 (Thanksgiving Day), Mrs. Lucchesi went into premature labor with her first child. Upon arriving at Desert Samaritan Hospital, Mrs. Lucchesi was examined by her obstetrician, Dr. Shill. As a result of that examination, Dr. Shill determined that Mrs. Lucchesi's cervix was well dilated with bulging membranes.

Around 5:00 that morning, Dr. Shill spoke by telephone to Dr. Frederic N. Stimmell. Dr. Stimmell was the physician on call for the Arizona Perinatal Project at Good Samaritan Hospital.[1] During this conversation, Dr. Shill described Mrs. Lucchesi's condition and informed Dr. Stimmell that delivery was inevitable. The doctors discussed the fact that there was a fetal heartbeat and that the fetus' chance of survival, even though minimal, would be increased by transporting Mrs. Lucchesi to the perinatal program at Good Samaritan Hospital. It was also agreed that this plan would be better for the mother, psychologically, because it would reassure her that everything possible was being done. Dr. Stimmell advised Dr. Shill that, as the physician on call for the Arizona Perinatal Project, it would be his responsibility to assume Mrs. Lucchesi's care. Subsequent to this conversation, Dr. Shill informed Mrs. Lucchesi that Dr. Stimmell would be waiting for her at Good Samaritan Hospital and that his experience and expertise in this area were important.[2]

---

**1.** The Arizona Perinatal Program is a maternal transport system designed to assist the delivery and care of high-risk pregnancies. Under the program, primary and secondary hospitals have the option of transporting high-risk maternal cases to a tertiary hospital (such as Good Samaritan) for the care available at a tertiary center.

**2.** At this point, there appears to be a dispute in the testimony as to whether Dr. Stimmell agreed

to be present at Good Samaritan Hospital. In her deposition, Mrs. Lucchesi testified that it was her understanding that Dr. Stimmell would be awaiting her arrival as his expertise was needed. However, Dr. Stimmell testified that he never personally agreed to attend to Mrs. Lucchesi. Rather, he testified that "I said, well, we, in the collective term, will be ready for her. . . ."

Before leaving Dr. Shill's care, Mrs. Lucchesi was administered medication in an attempt to slow or stop the contractions. She was then transported to Good Samaritan Hospital via an ambulance arranged for by Dr. Stimmell. She arrived at the hospital at approximately 5:45 a.m. and within five minutes, Dr. Stimmell was contacted. At that time, he informed the nursing staff that he would not be present for delivery.

Dr. Scott Partridge, a first-year intern, examined Mrs. Lucchesi shortly after she arrived at Good Samaritan Hospital. He found that she was completely dilated, fully effaced, had an abnormal presentation, and was contracting very actively. Following this examination, Dr. Partridge called Dr. Stimmell to report what he had found, including the abnormal presentation—which Dr. Partridge believed to be a breech or transverse presentation. Upon being told that delivery was likely inevitable, Dr. Stimmell instructed Dr. Partridge and Dr. Mac Whitford, a third-year resident, to rupture the membranes and deliver the infant.[3]

The Lucchesi's baby was delivered stillborn at approximately 6:25 a.m. Upon beginning delivery, it was determined that the infant was in a "double-footing" breech position—a presentation which involves a much greater hazard to the fetus than other breech positions. Neither Dr. Partridge nor Dr. Whitford had delivered a child under such circumstances. During the delivery itself, the child was decapitated—apparently due to tugging on the child's hip area after the mother's cervix had contracted. The child's head was extracted shortly thereafter.

Following the delivery, the fetal remains were examined by the Pathology Department at Good Samaritan Hospital and found to have had a gestational age of 21–22 weeks. A neonatologist who received the hospital and pathology reports was of the opinion that the fetus was pre-viable and had no possibility of surviving even a normal delivery.

Dr. Stimmell arrived at Good Samaritan Hospital between 8:00 and 9:00 that morning. He talked with Mrs. Lucchesi, stating that the delivery had been traumatic, but he did not reveal that the baby had been decapitated. He again talked with Mrs. Lucchesi during her hospitalization, but did not mention the decapitation on that occasion either.

Several months later, Mrs. Lucchesi tried to discover the reason she had not received a Rhogam injection after the delivery. Following repeated requests, her hospital records were sent to Dr. Shill. It was Dr. Shill who then informed the Lucchesis of the full circumstances surrounding the birth of their baby.

■ It is the Lucchesis' position that Dr. Stimmell's failure to attend the delivery and his decision not to inform the Lucchesis of the full details surrounding their child's birth, created a factual issue as to whether the conduct was so extreme and outrageous as to support a claim for intentional or reckless infliction of emotional distress. We agree.

■ The tort of intentional infliction of emotional distress was recognized by this state in *Savage v. Boies*, 77 Ariz. 355, 272 P.2d 349 (1954). To establish a claim under this tort, the conduct alleged must be "atrocious" and "beyond all possible bounds of decency" so that an average member of the community would regard it as outrageous. RESTATEMENT (SECOND) OF TORTS § 46 comment d (1965). Specifically, this court has stated that three elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the defendant's conduct must be capable of being characterized as "extreme and outrageous"; (2) the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that distress will result from his conduct; and

---

3. The testimony is undisputed that both Dr. Partridge and Dr. Whitford were present and participated in the delivery of the Lucchesis' baby. However, there is a conflict in the record as to whether or not a third physician, Dr. Cohen, was also present, and if so, what participation, if any, he/she had in the delivery.

(3) the defendant's conduct must have caused severe emotional distress. *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980).

In determining whether a defendant's conduct comes within these parameters, comment h to the RESTATEMENT (SECOND) OF TORTS § 46 provides:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. *Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability* (emphasis added).

*See also Cluff v. Farmers Ins. Exchange*, 10 Ariz.App. 560, 562, 460 P.2d 666, 668 (1969). Further, as the terms "outrageous conduct" and "severe emotional distress" are not readily capable of precise legal definition, a case-by-case analysis is required. *Midas Muffler Shop v. Ellison*, 133 Ariz. 194, 197, 650 P.2d 496, 499 (App. 1982). Nevertheless, factors that have been traditionally considered by a jury or court include: (1) the position occupied by the defendant (comment e); *see also Humphers v. First Interstate Bank*, 68 Or.App. 573, 684 P.2d 581 (1984) (tortious purpose element of tort of outrageous conduct found in breach of physician-patient relationship); and (2) defendant's knowledge that the plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental condition (comment f); *see also Richardson v. Pridmore*, 97 Cal. App.2d 124, 217 P.2d 113 (1950) (plaintiff, after suffering a miscarriage, entitled to recover for emotional distress caused by outrageous and intentional conduct of landlord).

In the present case, a practicing obstetrician, Dr. Shill, determined that Mrs. Lucchesi's premature delivery constituted a particularly complex medical situation requiring the expertise of a specialist. Dr. Stimmell, a specialist in high-risk deliveries, agreed that if there was any hope of saving the baby, the mother must be transported to a hospital where special facilities were available. The specialist further agreed that transporting the mother would benefit her psychologically by alleviating some of the stress and emotional upset the situation was causing her. Then, after stating that he would assume responsibility for the mother's care, Dr. Stimmell made no effort to meet the mother at the hospital. Instead, Mrs. Lucchesi was left to be attended during a traumatic delivery by a first-year intern and a third-year resident—neigher of whom had any experience with the type of breech delivery taking place (and who, presumably, had less experience than the obstetrician who originally indicated that the situation was too complex for his medical skills). The delivery was finally accomplished when the resident, tugging on the baby in an effort to extricate it from the birth canal, decapitated the child.

In explaining his decision not to leave home and await Mrs. Lucchesi's arrival at Good Samaritan Hospital, Dr. Stimmell testified at his deposition that it was normal practice for obstetricians to wait at home until the labor and delivery room staff called regarding the patient's condition. He further testified that had he left for Good Samaritan Hospital when he first learned of the urgency of Mrs. Lucchesi's condition from Dr. Shill, it would have taken only 25 minutes to leave his house, arrive at the hospital, scrub and prepare for delivery. We therefore believe that given the facts of this case, reasonable minds could differ as to whether Dr. Stimmell's decision to follow the "normal practice" in this case constituted an extreme and outrageous course of conduct.

In reviewing the granting of a motion for summary judgment, this court will not weigh the evidence. *Northern Contracting Co. v. Allis-Chalmers Corp.*, 117 Ariz. 374, 376, 573 P.2d 65, 67 (1977). If there is even the slightest doubt or uncertainty in respect to any issue of material fact, the request for summary judgment should be

denied. *Overson v. Cowley*, 136 Ariz. 60, 63, 664 P.2d 210, 213 (App.1982). Moreover, if the state of mind or intent of one of the parties is a material issue, summary judgment is improper. *Mid-Century Ins. Co. v. Duzykowski*, 131 Ariz. 428, 429, 641 P.2d 1272, 1273 (1982).

After carefully reviewing the record in this case, we believe the evidence concerning Dr. Stimmell's conduct before, during and after the birth of the Lucchesis' child created a factual issue so that a jury should have had an opportunity to decide whether defendant's conduct was outrageous and whether plaintiff suffered severe emotional distress. We are not declaring, as a matter of fact or law, that the circumstances in this case are to be equated with a tort of outrage. Rather, we merely hold that the conduct in this matter provided a jury question. Moreover, the existence of several factual inconsistencies in the record was sufficient to have precluded the entry of summary judgment. *Overson v. Cowley, supra*. Accordingly, we find the trial court erred in granting summary judgment.

The portion of the Court of Appeals opinion affirming summary judgment on Count Three of petitioner's complaint, in favor of Dr. Stimmell, is vacated. The matter is remanded to the trial court for further proceedings.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.