Robert ROSS, M.D. *v.* Jimmy PATTERSON, as Special Administrator, et al.

90-259                                        817 S.W.2d 418

Supreme Court of Arkansas
Opinion delivered October 28, 1991
[Rehearing denied November 25, 1991.*]

*Corbin and Brown, JJ., would grant rehearing.

*Friday, Eldredge & Clark*, by: *Phillip Malcom* and *Tonia P. Jones*, for appellant.

*Morgan E. Welch, P.A.*, by: *Morgan E. Welch*, for appellees.

JACK HOLT, JR., Chief Justice. This is a tort of outrage case.

The appellant, Dr. Robert Ross, treated the appellee, Dorothy Patterson, as a patient in his OB/GYN practice in Pine Bluff, Arkansas. During the course of Mrs. Patterson's pregnancy, and unknown to her at that time, Dr. Ross developed a substance abuse problem with drugs and alcohol.

The day before Mrs. Patterson went into labor in September 1984, Dr. Ross received a complaint and notice of hearing from the Arkansas State Medical Board that he was to appear before them in December on charges of falsifying drug prescriptions. Dr. Ross, who later admitted his alcohol and drug addictions, immediately made arrangements for treatment of his substance abuse and left Pine Bluff to be admitted to an impaired physician's rehabilitation center in Mississippi, leaving his wife to handle the transfer of responsibility of his patients to a medical group of which he was a member.

As a result of Dr. Ross's absence when Mrs. Patterson went into labor and when she was admitted into Jefferson Memorial Hospital, Dr. Siva Kaipa, one of the physicians who took calls for Dr. Ross as part of the medical group, became Mrs. Patterson's attending physician and delivered her baby, who died several hours after birth. After the baby's funeral, Mrs. Patterson learned that Dr. Ross's absence was due to his efforts to address his substance abuse.

The estate of the deceased infant, Christopher Patterson, filed a medical malpractice suit against Dr. Ross, his nurse, Frances Vanlandingham, Dr. Kaipa, and Jefferson Memorial Hospital. Mrs. Patterson also asserted a personal claim against Dr. Ross, Nurse Vanlandingham, and the Jefferson Memorial Hospital for deceit and the tort of outrage.

Prior to trial, the appellees entered into a settlement agreement with the hospital. A jury trial was held between December 5 and December 21, 1989, and the medical malpractice claim against Dr. Kaipa resulted in a mistrial. Dr. Ross and Nurse Vanlandingham were both found not liable for medical malpractice or deceit in connection with the infant's death. The jury also found that Nurse Vanlandingham was not liable for the tort of outrage; however, it returned a verdict against Dr. Ross in this regard and awarded Mrs. Patterson $175,000 in compensatory damages and $50,000 in punitive damages.

On appeal, Dr. Ross asserts three points of error: 1) that there was not substantial evidence to support the jury's verdict against him for the tort of outrage, 2) that the trial court abused its discretion in admitting unfairly prejudicial evidence of his substance abuse, and 3) that the trial court erred in the manner in which it instructed the jury on the issues of tort of outrage and punitive damages.

We have taken a very narrow view of claims for the tort of outrage, also known as the intentional infliction of emotional distress, *see Harris* v. *Arkansas Book Co.*, 287 Ark. 353, 700 S.W.2d 41 (1985) (citing *Givens* v. *Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982)), and we continue to do so here. We find that there was not substantial evidence to support the jury's verdict against Dr. Ross for the tort of outrage, and we reverse and dismiss.

In *Sterling Drug, Inc.* v. *Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988) (citing *M.B.M. Co., Inc.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980)), we stated that one is subject to liability for outrage if he or she willfully or wantonly causes severe emotional distress to another by extreme and outrageous conduct: conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.

Furthermore, the emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. *Tandy Corp.* v. *Bone,* 283 Ark. 399, 678 S.W.2d 312 (1984).

Furthermore, the tort of outrage is not easily established and requires clear-cut proof; merely describing the conduct as outrageous does not make it so. *Givens* v. *Hixson, supra.*

In *Sterling Drug,* we found that where a corporate employer suspected that an employee had reported it to the General Services Administration for pricing violations, and had entered on an eighteen-month campaign to force the employee to resign even though agents of the employer knew that the employee was under pressure because of a recent divorce, the employer's conduct did not rise to a sufficient level to support a verdict for outrage as recognition of the tort of outrage did not open the doors of the courts to every slight insult or indignity one must endure in life.

Likewise, in *Sterling* v. *Upjohn Healthcare Servs., Inc.,* 299 Ark. 278, 772 S.W.2d 329 (1989), we held that where an employee's supervisor had taken a dislike to him and made various atempts to undermine his authority with his employees and to have him fired by falsely accusing him of always being drunk and of making untrue statements on his job application, by delaying the processing of his expense vouchers, by having employees watch him and report back to his supervisor, by instructing him not to communicate with other employees, and by cursing him, the conduct did not meet the standard required for the tort of outrage.

In *Neff* v. *St. Paul Fire & Marine Ins. Co.,* 304 Ark. 18, 799 S.W.2d 795 (1990), we also noted that where the hospital was doing no more than it had a legal right to do — releasing the seventeen-week-old fetal remains to one of the parents without consulting the other — the conduct, even if improper, would not equate with outrageous conduct necessary for the tort of outrage. *See generally Deason* v. *Farmers and Merchants Bank,* 299 Ark. 167, 771 S.W.2d 749 (1989); *Bell* v. *McManus,* 294 Ark. 275, 742 S.W.2d 559 (1988); and *Webb* v. *HCA Health Servs. of Midwest, Inc.,* 300 Ark. 613, 780 S.W.2d 571 (1989).

In contrast, where an employer interrogated an employee, whom it suspected of theft, at thirty minute intervals for most of a day, denied him valium when he was under obvious stress, and threatened him with arrest, we found that there was substantial evidence to support the jury verdict for outrage and placed special emphasis on the fact that even though the employer knew of the employee's lower than normal emotional stamina, it refused to permit him to take his medication during the interrogation. *Tandy Corp.* v. *Bone, supra.*

In *Hess* v. *Treece,* 286 Ark. 434, 693 S.W.2d 792 (1985), *cert. denied,* 475 U.S. 1036 (1986), Treece, a police officer, sued Hess, the Little Rock City Director, for outrage. Hess, who was angry with Treece over a personal matter, conducted surveillance of Treece, communicated to other individuals that he would have Treece fired at any cost, and apparently made false reports concerning Treece's employment conduct. Basing our decision in part on the fact that Hess's actions continued over a two year time span, we found substantial evidence to support the jury verdict for outrage.

We also found sufficient evidence to support a finding that corporations operating a perpetual care cemetary had committed the tort of outrage where the corporations' agents had repeatedly driven heavy equipment across two gravesites of members of the appellees' family in an attempt to alleviate a drainage problem which the corporations had caused and which could have been solved in other ways, and had continued construction even after the vaults had been exposed and the distress to the appellees had become apparent. *Growth Properties I* v. *Cannon,* 282 Ark. 472, 669 S.W.2d 447 (1980).

In viewing the facts of this case, we cannot find substantial evidence to satisfy the requirements of the tort of outrage set out in *Sterling Drug, Inc.* v. *Oxford, supra,* or *Tandy Corp.* v. *Bone, supra.* To the contrary, Mrs. Patterson was not aware during the course of her pregnancy that Dr. Ross had a substance abuse problem. When Dr. Ross was confronted with the complaint from the Arkansas State Medical Board, he enlisted the help of his wife to handle the necessary communications for the transfer of responsibility for his patients to the "call group" (of which he was a member) consisting of Drs. Kaipa, Devi, and Bracy. Although

there was initially some confusion at the hospital as to which doctor would be responsible for Dr. Ross's patients when Mrs. Patterson first went to the hospital, the confusion was resolved by the time that she was actually in labor and admitted to the hospital.

Mrs. Patterson claims that she suffered severe emotional distress because Dr. Ross never saw her during the last month of her preganancy and because he failed to personally inform her that he was leaving town.

Even if we were to accept Mrs. Patterson's claim as true that she was upset because Dr. Ross did not see her during the last month of her pregnancy, which fact is disputed by Dr. Ross and Nurse Vanlandingham as well as office records of her visits, Mrs. Patterson testified that she always had the utmost faith and confidence in Dr. Ross, even in the last month of her pregnancy, and that she had resisted suggestions from family members that she change doctors.

Additionally, Dr. Reid Pierce, another physician with an OB/GYN practice in Pine Bluff, Arkansas, testified that Dr. Ross's decision to ask his wife to handle the transfer of responsibility for his patients to a physician on call for him was professionaly acceptable. Mrs. Patterson had also signed a form acknowledging that he might be unavailable at the time of her delivery and consenting to treatment by another physician.

Mrs. Patterson's own psychologist testified that her depression stemmed primarily from the death of her child, the unfortunate occurrence of which the jury had found Dr. Ross to be not liable. In fact, Mrs. Patterson testified that her severe emotional distress did not begin until after the death of her baby, when she learned the reason for Dr. Ross's absence.

Although there is some testimony that Mrs. Patterson suffered from "post-partum emotional distress" brought about by her realization of Dr. Ross's alcohol and drug abuse and that she blamed herself for "trusting" him, it is insufficient to sustain the jury's findings.

█ While we cannot and do not sanction Dr. Ross's intemperate use of alcohol, drug abuse, and lack of professionalism in not assisting in making final arrangements for Mrs.

Patterson's delivery, there is no clear-cut proof, as we require in all tort of outrage cases, that his conduct toward Mrs. Patterson was so outrageous in character and so extreme in degree as to rise to the level necessary for the tort of outrage.

In sum, then, there is a lack of substantial evidence to support Dr. Ross's liability for the tort of outrage. Consequently, we need not discuss Dr. Ross's remaining two points of error.

Reversed and dismissed.

GLAZE, CORBIN and BROWN, JJ., dissent.

DONALD L. CORBIN, Justice, dissenting. I dissent.

This court's distaste for the tort of outrage results in a majority opinion that blatantly ignores our firmly established, deferential standard of review in sufficiency of the evidence cases. It is a well-settled rule that this court will affirm sufficiency of the evidence cases "if there is *any* substantial evidence to support a jury's verdict, . . . ." *Boyd* v. *Reddick*, 264 Ark. 671, 675, 573 S.W.2d 634, 637 (1978). (Emphasis supplied.) In determining whether substantial evidence exists, we have stated that we will rely on two crucial principles to avoid invading the province of the jury: 1) We will consider only the evidence favorable to the successful party below, *Love* v. *H.F. Constr. Co.*, 261 Ark. 831, 552 S.W.2d 15 (1977); and, 2) we defer to the jury's resolution of the issue unless we can say that there is no reasonable probability to support the version of the successful party below. *Id.*

In the instant case, the jury's verdict reflected a studied deliberation of the lay and medical testimony elicited during a two week trial. The majority, however, disregards our well-settled standard of review and its supporting rationale to undertake a *de novo* review of the evidence. This *de novo* analysis focuses on testimony detrimental to Mrs. Patterson's claim rather than on testimony supporting her allegations about Dr. Ross' behavior. Such an analysis cannot be reconciled with our oft-stated concern for protecting the province of the jury. I believe that our prior explanation of this concern is applicable to the case before the court today:

> Both of these parties were interested in the results. Consequently, the jury was not duty bound to accept either

party's testimony as being undisputed. Indeed, a fact question was presented for resolution by the jury. The jury heard the witnesses, observed their demeanor and conduct on the witness stand and, therefore, were in a better position to judge the credibility of the witnesses.

*Boyd, supra,* at 675, 573 S.W.2d at 637.

After viewing the evidence favorable to appellee Dorothy Patterson, I believe substantial evidence exists to support the jury's verdict on the outrage claim. The evidence indicates that Dr. Ross knew of Mrs. Patterson's precarious emotional state and the potential injurious consequences to Mrs. Patterson of his absence during the latter part of her pregnancy. Dr. Ross admitted that his incapacity had been developing for some time yet he deliberately chose not to advise his patients to retain alternative obstetric care during the course of their pregnancies. Instead, he rubber-stamped a prescription pad, leaving his nurse to prescribe medication for his patients. Mrs. Patterson testified that after receiving one such prescription, she was unable to have it filled because the pharmacist became suspicious.

Mrs. Patterson also produced both lay and expert testimony concerning the bond she felt with the doctor to whom she entrusted her health and the delivery of her baby. Her evidence indicated that Dr. Ross' treatment of her throughout the last trimester of her pregnancy caused her severe emotional distress because his deception concerning his whereabouts left her unable to procure medical treatment for the obstetric problems she developed near the end of her pregnancy. Particularly distressing to Mrs. Patterson was her experience at the hospital hours before her baby's birth. When Mrs. Patterson began experiencing contractions, she went to the hospital only to learn that no arrangements had been made for her. Confused about the whereabouts of Dr. Ross, the hospital staff sedated Mrs. Patterson and sent her home. She returned only a few hours later to deliver her son.

After the jury heard the evidence, the trial court properly instructed the jury on the elements of outrage. The jury voted nine to three to award damages under the tort theory of outrage, and I do not think it coincidental that five out of six women on the jury agreed that Dr. Ross' treatment of his expectant patient rose to

the level of outrage. Based on Mrs. Patterson's evidence, I believe it was certainly within the jury's province to find that Dr. Ross willfully or wantonly caused severe emotional distress to Dorothy Patterson by extreme and outrageous conduct.

BROWN, J., joins in this dissent.

ROBERT L. BROWN, Justice, dissenting. The majority concludes that while Dr. Ross's alcohol and drug abuse and lack of professionalism were disgraceful and without excuse, these circumstances do not rise to the level of outrageous conduct. I disagree.

The jury determined on the facts presented that Dr. Ross was not available to Mrs. Patterson during her time of need, knowing full well that Mrs. Patterson had previously had a miscarriage and was experiencing difficulties in her current pregnancy. The fact that Dr. Ross was a functional alcoholic and addicted to cough syrup is not the issue here. What is at issue is whether a physician who caused his patient considerable pain and mental anguish by abandoning her during an emotionally wrenching time committed the tort of outrage, taking into consideration the fact that she had previously experienced a complicated pregnancy and was "scared to death" about what was happening to her in her current pregnancy.

On appeal we look to whether substantial evidence exists to support the jury verdict and judgment. I believe that there was sufficient evidence of outrageous conduct on the part of Dr. Ross prior to the baby's delivery on September 1, 1984, which resulted in the mental anguish experienced by Mrs. Patterson. The following facts, for example, support the jury's award:

a. Dr. Ross did not see or examine Mrs. Patterson during the last month of her pregnancy. His nurse performed the examination. (Dr. Ross denies the extent of his absence, but even according to his testimony and records, he had no contact with her the last ten days of her pregnancy.)

b. Mrs. Patterson was experiencing some problems with the pregnancy. Early in May and June she had complained of low abdominal pain. On August 13, 1984 she reported some spotting. The progress notes show on

August 15 that she was not sleeping, that she was hurting a lot, and that she was "leaking." On August 21 she complained of contractions and nausea.

 c. Mrs. Patterson told the jury that in August the baby had quit moving as much, and she was hurting and sick and was losing weight. She was scared to death, she testified. She had an intuition something was wrong and was really upset. She went to the Pine Bluff hospital from her home in McGehee on September 1 after being up all night with more bleeding and leaking. She had telephoned Dr. Ross several times from her home, and he had not returned the calls.

 d. Mrs. Patterson continued to have faith in Dr. Ross up until delivery because he had successfully delivered her first child. (He had not been the doctor for the previous pregnancy that resulted in a miscarriage.) As she testified, "He just wasn't there for me."

 e. Dr. Ross admitted that he usually tried to see pregnant women who had previously lost a baby, as had Mrs. Patterson, more often than others because of their emotional state.

The majority emphasizes that Mrs. Patterson signed the standard form agreeing to delivery by another physician in the event Dr. Ross was unavailable. But unavailability on the day of delivery is a far cry from abandonment over the last month of a difficult pregnancy, when that woman had previously experienced a miscarriage.

In Arkansas we recognize the tort of outrage as intentional conduct that results in injury which is so abhorrent that a civilized society cannot condone it. Part of our AMI Instruction 404 reads:

 A person acts willfully and wantonly when he knows or should know in the light of surrounding circumstances that his conduct will naturally and probably result in emotional distress and continues such conduct in reckless disregard of the consequences.

The law does not require that Dr. Ross intend to harm Mrs. Patterson personally by his conduct. It only requires that he act

"willfully and wantonly" knowing that his conduct will probably cause someone emotional distress. Here, Dr. Ross acted in what he had to know was an impaired state for an extended period of time and then abandoned his patient altogether. Abandoning a woman in her last days of pregnancy without any warning or explanation and with knowledge that some difficulties are associated with the pregnancy and that the woman previously had experienced a miscarriage, easily qualifies as outrageous conduct. Under the evidence presented, the jury could readily have found that Dr. Ross committed the tort. He existed in an impaired state and had for some time during Mrs. Patterson's pregnancy. He should have made arrangements to care for her — not only on the date of delivery — but for the days or weeks preceding delivery. This he failed to do.

In 1986 the Supreme Court of Arizona found that the trial court had erred in granting summary judgment in favor of an OB-GYN physician on a tort of outrage claim involving abandonment by that physician. *See Lucchesi* v. *Stimmell*, 716 P.2d 1013 (Ariz. 1986). There, the allegation against the defendant physician was that he had failed to attend the delivery of the child and had failed to inform the parents of the child of the full circumstances of the birth, all of which caused the parents emotional distress. The physician involved was a high-risk specialist who had said that he would assume responsibility for the mother's care. He made no effort to meet the mother at the hospital, it was a breech delivery, and doctors who had less experience with high-risk deliveries decapitated the child in an effort to extricate the child from the birth canal. The issue in *Lucchesi* was whether the defendant physician had failed to follow an appropriate practice in deciding when to leave for the hospital and whether that failure constituted outrageous conduct. The court in *Lucchesi* determined that the intent or state of mind of the doctor was a material fact question for the jury to decide and, accordingly, summary judgment was improper.

In the case before us the majority has decided how this case should be decided. With respect to the factual questions of Dr. Ross's state of mind or intent, his attitude toward Mrs. Patterson's particular pregnancy, and his knowledge of his own impaired condition, all of which were presented to the jury for resolution with supporting evidence, it is now improper for this

court to usurp that role and reverse a jury verdict. Certainly, *Lucchesi* v. *Stimmell* is precedent for the appellee's position that this case embraces factual matters for a jury to determine. To suggest that insufficient facts illustrative of abandonment and emotional distress were presented to the jury is simply not correct. I would affirm.

GLAZE and CORBIN, JJ., join.