129 F.3d 125
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Irene Amaya DeMORUA; Araceli Morua-Amaya; Brenda Cecilia
Morua-Amaya; Olga Amaya De Vasquez, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 96-16907.
 United States Court of Appeals, Ninth Circuit.
 Submitted** Sept. 19, 1997.
Filed Nov. 6, 1997.
 
 Appeal from the United States District Court for the District of Arizona, No. CV-93-01312-SMM; Stephen M. McNamee, District Judge, Presiding.
 Before: ALDISERT,*** SNEED, and THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Irene Amaya De Morua, Acaceli Morua-Amaya, Brenda Cecilia Morua-Amaya, and Olga Amaya De Vasquez (" 'the De Moruas") appeal the district court's judgment for the United States ("border patrol") in the De Moruas' Federal Tort Claims Act ("FTCA") suit. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
 
 I.
 FACTS AND PROCEDURAL HISTORY
 
 3
 This case arises because no drugs were found following a search by federal agents. On April 2, 1992, the De Moruas entered the United States at the Nogales, Arizona port of entry. The De Moruas, all Mexican citizens from the state of Sonora, drove a silver/grey 1995 Dodge Ram Charger. Heading northwest on I-10, the De Moruas, at approximately 9:00 p.m., passed Mark Miller, an agent with the Casa Grande border patrol station.
 
 
 4
 The Casa Grande station had received information from the DEA that a group was smuggling narcotics in Dodge Ram Chargers. The station had also issued the following intelligence report:
 
 
 5
 Or March 23, 1992, at 6:50 p.m., a grey 1986 Dodge Ram Charger, carrying Mexican license plates, heading in a Northwesterly direction or I-10 was stopped by the United States Border Patrol in the approximate location of mile post 191; the vehicle showed signs that work had been performed on the gas tank; the driver agreed to follow the agent to the Casa Grande Station for further inspection of the vehicle, which included a sniff search by a canine; the canine alerted to narcotics in the gas tank area of the vehicle; and the vehicle was found to have an altered gas tank in which narcotics were found;
 
 
 6
 On March 26, 1992, at 8:55 p.m., a silver/grey 1988 Dodge Ram Charger, carrying Mexican license plates, heading in a Northwesterly direction on I-10 was stopped by the United States Border Patrol in the approximate location of milepost 183; the vehicle showed signs that work had been performed on the gas tank; the driver agreed to follow the agent to the Casa Grande Station for further inspection of the vehicle, which included a sniff search by a canine; the canine alerted to narcotics in the gas tank area of the vehicle; and the vehicle was found to have an altered gas tank in which narcotics were found;
 
 
 7
 In April [1st] of 1992, a silver/grey 1990 Dodge Ram Charger, carrying Mexican license plates, heading in a Northwesterly direction on I-10 was stopped by the United States Border Patrol in the approximate location of milepost 193; the vehicle showed signs that work had been performed on the gas tank; the driver agreed to follow the agent to the Casa Grande Station for further inspection of the vehicle, which included a sniff search by a canine; the canine alerted to narcotics in the gas tank area of the vehicle; and the vehicle was found to have an altered gas tank in which narcotics were found; and
 
 
 8
 Late model Dodge Ram Chargers are equipped with large gas tanks that are easily altered and compartmentalized to conceal narcotics.
 
 
 9
 Agent Miller was aware of the intelligence report when he stopped the De Moruas at milepost 193. They told Miller that the vehicle belonged to their uncle, Mr. Villalobos. When Miller requested ownership papers, the De Moruas handed him a Social Security hospital invoice. Next, Miller opened the unlocked gas cap and noticed scratches inside the nozzle area where the tube appeared to have been altered. Underneath the vehicle, Miller observed scratches on the tank plate and shiny marks on the bolts securing the tank to the vehicles' undercarriage. Because the remainder of the undercarriage was covered with mud, Miller concluded that the tank had recently been removed. During Miller's inspection, several of the women exited the vehicle despite Miller's repeated request to remain inside the vehicle. Because Miller did not have a dog in his vehicle, he ordered the De Moruas to follow him to the Casa Grande station where all arrived at approximately 10:00 p. m.
 
 
 10
 At the Casa Grande station, the De Moruas were placed in an office and, after some delay in obtaining a dog, the agents conducted a dog sniff search underneath the vehicle. According to the De Moruas, the agents refused their request to make a telephone call and to view the dog sniff search. Officer Brown, a narcotics detection dog handler, supervised the dog sniff search. The dog alerted to narcotics in the gas tank. Thereafter, both Officer Brown and Agent Cole examined the gas tank and concluded that it showed signs of tampering. After informing agent Miller of their findings, Miller read the De Moruas their Miranda rights. According to Brenda Cecelia Morua-Amaya, Miller additionally told the De Moruas that drugs had been found and that they were under arrest.[1] However, no drugs were found when the agents removed and searched the gas tank. Thereafter, the agents reattached the gas tank to the vehicle and informed the De Moruas that they were free to leave the station. At approximately 1:00 a.m., the De Moruas left the Casa Grande station.
 
 
 11
 The De Moruas brought an FTCA suit in Arizona district court claiming: (1) unlawful detention; (2) unlawful arrest; (3) unlawful search of personal effects and vehicle; and (4) intentional/negligent infliction of emotional distress. Following a bifurcated bench trial on the issue of liability, the district court entered judgment in favor of the United States. The De Moruas' timely appeal followed.
 
 II.
 DISCUSSION
 
 12
 The De Moruas contend that the district court erred by rejecting their FTCA suit. They contend that the border patrol lacked reasonable suspicion to stop their vehicle and that there was no probable cause to move the De Moruas to the station, to conduct a dog sniff search, and to remove their vehicle's gas tank. We disagree.
 
 A. Standard of Review
 
 13
 Whether reasonable suspicion or probable cause existed to make a warrantless search and seizure is a legal conclusion subject to de novo review. Ornelas v. United States, 116 S.Ct. 1657, 1663 (1996).
 
 B. Merits
 
 14
 Under the FTCA, the United States is liable for common law torts committed by federal employees within the scope of their employment. See 28 U.S.C. §§ 1346(b), 2674 (1994). The FTCA allows liability for false arrest or imprisonment when such torts are committed by federal law enforcement officers. See 28 U.S.C. § 2680(h) (1994). Liability is determined by the tort law of the state where the claim arose. See 28 U.S.C. § 1346(b) (1994).
 
 
 15
 Under Arizona law, false arrest or false imprisonment is "the detention of a person without his consent and without lawful authority." See Slade v. City of Phoenix, 541 P.2d 550, 552 (Ariz.1975).[2] Probable cause is an absolute defense to a claim of false arrest and imprisonment. See Hockett v. City of Tucson, 678 P.2d 502, 505 (Ariz.Ct.App.1983). This court must apply federal law to determine whether probable cause existed. See Rhoden v. United States, 55 F.3d 428, 431 (9th Cir.1995) (per curiam); see also Gasho v. United States, 39 F.3d 1420, 1427-32 (9th Cir.1994).
 
 1. Reasonable Suspicion To Stop
 
 16
 The De Moruas first insist that the border patrol conducted an illegal stop because it lacked a reasonable suspicion to stop. Reasonable suspicion has been described as " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." See Ornelas, 116 S.Ct. at 1661 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).
 
 
 17
 The court concludes that the border patrol possessed a particularized and objective basis for suspecting the De Moruas of narcotics smuggling. First, the agents were aware of a DEA report concerning a smuggling group using Dodge Ram Chargers. Second, the Casa Grande station had issued its own report concerning drug smuggling in Mexican-plated Dodge Ram Chargers. Third, the De Moruas' vehicle fit the description set forth in the intelligence report. Finally, the De Moruas were located in a high drug smuggling area near the Mexican border. Thus, we hold the border patrol had reasonable suspicion to stop the De Moruas' vehicle. See Orrelas, 116 S.Ct. at 1661-62.[3]
 
 2. Probable Cause to Detain and Search
 
 18
 The De Moruas contend that their detention at the Casa Grande station, during which agents conducted a dog sniff search and removed the gas tank, constituted an arrest without probable cause. We disagree.
 
 
 19
 We have described probable cause in this context many times. For example, "[f]ounded suspicion may ripen into probable cause to arrest or search through the occurrence of after-the-stop facts and incidents." See United States v. Avalos-Ochoa, 557 F.2d 1299, 1303 (9th Cir.1977). "[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists." See Ornelas, 116 S.Ct. at 1663. Also, probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Id. at 1661.
 
 
 20
 We conclude that Agent Miller had probable cause to detain the De Moruas and transfer them to the border patrol station for a dog sniff search.[4] First, Agent Miller observed scratches on both the gas tank nozzle and tank. Second, Miller observed shiny marks on the bolts, despite the remainder of the undercarriage being covered in mud. In Miller's experience, such factors indicated that the gas tank had recently been removed. See Ornelas, 116 S.Ct. at 1663. Third, the De Moruas produced an unresponsive social security document in response to Miller's request for ownership papers. Fourth, the De Moruas disregarded Miller's repeated request to remain inside their vehicle. Fifth, the De Moruas were travelling to Los Angeles, a known "drug hub." These factors, viewed in conjunction with the recently issued intelligence report, would warrant a reasonably prudent person to believe that the De Moruas' gas tank contained contraband. See Ornelas, 116 S.Ct. at 1161-62; see also Avalos-Ochoa, 557 F.2d at 1303. Moreover, the dog's alert to the gas tank area, combined with the earlier probable cause factors, constituted probable cause to remove the vehicle's gas tank to search for drugs. See Ornelas, 116 S.Ct. at 1163. We therefore conclude that the district court did not err by rejecting the De Moruas' FTCA claims for unlawful arrest, unlawful detention, and unlawful search. See Gasho, 39 F.3d at 1427; see also Hockett, 678 P.2d at 505.
 
 
 21
 3. Intentional Infliction of Emotional Distress Claim
 
 
 22
 We also hold that the district court did not err by rejecting the De Moruas' intentional infliction of emotional distress claim. They did not demonstrate any act's that could be classified as "outrageous" under Arizona law.
 
 
 23
 The FTCA allows liability for intentional infliction of emotional distress committed by federal law enforcement officers. See Gasho, 39 F.3d at 1434. Liability is determined by the tort law of the state where the claim arose. See 28 U.S.C. § 1346(b) (1994).
 
 
 24
 Under Arizona law, "three elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the defendant's conduct must be capable of being characterized as 'extreme and outrageous'; (2) the defendant must either intend to cause Emotional distress or recklessly disregard the near certainty that distress will result from his conduct; and (3) the defendant's conduct must have caused severe emotional distress." See Lucchesi v. Frederick N. Stimmell, M.D., Ltd., 716 P.2d 1013, 1015-16 (Ariz.1986). To be "extreme and outrageous" the conduct alleged "must be 'atrocious' and 'beyond all possible bounds of decency' so that an average member of the community would regard it as outrageous." Id. at 1015 (quoting Restatement (Second) of Torts § 46 cmt.d (1965)).
 
 
 25
 In support of their claim, the De Moruas assert that the border patrol committed outrageous acts by: (1) conducting an unlawful search and detention; (2) forbidding the De Moruas from viewing the dog sniff search; (3) informing the De Moruas that the agents had discovered drugs; (4) arresting the De Moruas for drug smuggling; (5) "Mirandizing" the De Moruas; (6) forbidding the De Moruas from making a telephone call; and (7) engaging in trickery in order to secure a confession.[5]
 
 
 26
 Assuming that the border patrol committed each of the above-mentioned acts, the De Moruas nevertheless failed to meet the criteria for "extreme and outrageous" conduct under Arizona law. See Rondelli v. County of Pima, 386 P.2d 1295, 1301-02 (Ariz.Ct.App.1978); Cf. Lucchesi, 716 P.2d at 1016-17. Thus, the district court did not err in rejecting the De Moruas' intentional infliction of emotional distress claim. See Rondelli, 586 P.2d at 1302.[6]
 
 III.
 CONCLUSION
 
 27
 The district court's judgment is AFFIRMED.
 
 
 
 **
 The panel finds this case appropriate for submission without argument pursuant to 9th Cir. R. 34-4 and Fed. R.App. P. 34(a)
 
 
 **
 * Honorable Ruggero J. Aldisert, Senior Circuit Judge for the Third Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 The trial was replete with conflicting testimony on this point. Araceli Morua-Amaya corroborated Brenda's rendition of the facts, but later contradicted herself by stating that Miller never actually stated that drugs had been found. Olga Amaya De Vasquez testified that Agent Miller simply told the women that "they were being detained because something had been found." The district court made no findings of fact on this point
 
 
 [2]
 Although the De Moruas' complaint alleged "unlawful detention," "unlawful arrest," arid "unlawful search of personal effects and vehicle," the recognized tort under Arizona law is false arrest and imprisonment. See Ariz.Rev.Stat. Ann. § 13-1303 (1989); see also Slade, 541 P.2d at 552
 
 
 [3]
 We further note that agent Miller's search of the unlocked gas tank nozzle and undercarriage were permissible as a Terry-type search. See United States v. Place, 462 U.S. 696, 706 (1983)
 
 
 [4]
 We additionally conclude that the district court's factual finding that "[p]laintiffs were ordered to follow the officers to their office" was not clearly erroneous. See Yako v. United States, 891 .F.2d 738, 745 (9th Cir.1989); see also Swetnam v. F.W. Woolworth Co., 318 P.2d 364, 366 (Ariz.1957)
 
 
 [5]
 The district court did not make specific factual findings as to whether the border patrol agents either: (1) told the De Moruas that drugs had been found; or (2) engaged in trickery in order to obtain a confession
 
 
 [6]
 Because we reject the De Moruas' intentional infliction of emotional distress claim on the merits, we need not decide whether the agents' alleged conduct was shielded by the discretionary function and misrepresentation exceptions