888 P.2d 1375

Larry NELSON and Dixie Lee Nelson, Plaintiffs–Appellees, Cross–Appellants,

v.

The PHOENIX RESORT CORPORATION, a Delaware corporation; Crescent Holdings, Inc., a Delaware corporation, Defendants–Appellants, Cross–Appellees.

Nos. 1 CA–CV 92–0067, 1 CA–CV 92–0081.

Court of Appeals of Arizona, Division 1, Department E.

Sept. 6, 1994.

Review Denied Feb. 22, 1995.

The Langerman Law Offices, P.A. by Amy G. Langerman, Phoenix, for plaintiffs-appellees/cross-appellants.

Morrison & Hecker by Mark A. Nadeau, David L. Abney, Stephen B. White, Phoenix, and W. Dennis Cross, Kansas City, MO, for defendants-appellants/cross-appellees.

OPINION

JACOBSON, Presiding Judge.

Appellants Phoenix Resort Corporation (PRC) and Crescent Holdings, Inc. (CHI, or, collectively, defendants) appeal from judgment in favor of appellees Larry and Dixie Lee Nelson (collectively, plaintiff) for breach of a written employment contract, and from the trial court's denial of defendants' motion for judgment notwithstanding the verdict, or, in the alternative, motion for a new trial.[1] Defendants' appeal on the contract claim raises two issues:

---

1. Defendants also appealed from judgment in favor of coplaintiff Kevin Kaspszak, but, after settlement between the parties, that portion of the appeal was dismissed.

1. Should the trial court have denied summary judgment on plaintiff's contract claim because the contract was unenforceable as violative of PRC's bylaws and CHI's shareholder agreement?

2. Should the trial court have vacated summary judgment on the contract claim when defendants raised allegations that Charles H Keating's signature on the contract was forged and that plaintiff committed perjury during trial?

Plaintiff has cross-appealed from the trial court's pretrial order granting summary judgment in favor of defendants on plaintiff's tort claims for breach of the implied covenant of good faith and fair dealing in the employment contract and intentional infliction of emotional distress.[2]

## STANDARDS OF REVIEW

In this case, we deal with differing standards of review, depending on the procedural status of each issue raised.

In reviewing a trial court's ruling on cross-motions for summary judgment, we have *de novo* review of a question of law. *Aldabbagh v. Arizona Dep't of Liquor Licenses & Control,* 162 Ariz. 415, 418, 783 P.2d 1207, 1210 (App.1989). However, when reviewing entry of summary judgment, we view the facts in a light most favorable to the party opposing the motion. *Wagner v. City of Globe,* 150 Ariz. 82, 83, 722 P.2d 250, 251 (1986). Summary judgment is inappropriate where the facts, even if undisputed, would allow reasonable minds to differ. *Orme School v. Reeves,* 166 Ariz. 301, 310, 802 P.2d 1000, 1009 (1990). We review denials of motions for judgment notwithstanding the verdict and for new trial on an abuse of discretion standard. *Mammo v. State,* 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (App. 1983).

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant PRC, a wholly-owned subsidiary of CHI, was the former owner and operator of the Phoenician Golf and Tennis Resort (Phoenician). Through a limited partnership made up of wholly-owned subsidiaries of Lincoln Savings and Loan Association (Lincoln), which was in turn a subsidiary of American Continental Corporation (ACC), defendants controlled 55% of the stock of CHI; the other 45% of the stock was owned by the Kuwait Investment Office (KIO).

On April 14, 1989, the Federal Home Loan Bank Board placed Lincoln in conservatorship, and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as conservator, with the Federal Deposit Insurance Corporation (FDIC) acting as managing agent. On August 9, 1989, the Resolution Trust Corporation (RTC) became the conservator of Lincoln. *See* Financial Institutions Reform, Recovery, and Enforcement Act, 103 Stat. 183 (1989). The RTC retained the FDIC agent who had been acting as managing agent of the conservatorship. The conservatorship included control of 55% of the stock of PRC.

In April 1989, ACC and eleven of Lincoln's subsidiaries filed bankruptcy proceedings and actions in federal court challenging the rights of the FDIC and FSLIC to manage the Lincoln subsidiaries. On April 17, 1989, the FDIC's managing agent, Mark Randall, attempted to remove the officers and directors of CHI and PRC, including the president and chief executive officer, Charles H Keating, Jr., by asserting the conservator's right, as majority shareholder, to change the management of the wholly-owned subsidiaries. On April 24, 1989, ACC's corporate counsel informed Randall that this action would violate defendants' corporate documents, which required a three-quarters vote of the shareholders and approval of the board of directors to effect such a change. The FDIC did not obtain the consent of the KIO until November 1989, and the former corporate management, including Keating, remained in control until then.

---

**2.** Plaintiff also appealed from the trial court's ruling that treble damages under A.R.S. § 23–355 were inapplicable to this case, but that issue has been abandoned by failure to argue it in the briefs. Summary judgment in defendants' favor on plaintiff's remaining claim for defamation is not at issue on appeal.

In April 1989, Keating offered plaintiff Larry Nelson, who was then employed by ACC, a position as chief financial officer (CFO) of PRC. Although plaintiff first refused because of the uncertainties surrounding control of the management of the Phoenician, he subsequently agreed to a temporary employment at the resort to develop a five-year operating budget. During that project, plaintiff was in contact with Jane Ashton, who had power of attorney for the KIO. Plaintiff eventually agreed to accept the CFO job offered by Keating, and the parties negotiated and executed the following written employment contract:

### EMPLOYMENT AGREEMENT

This agreement between Larry Nelson and the Phoenix Resort Corporation (PRC) employs Nelson for a period of two (2) years at an annual salary of not less than $100,000 payable not less frequently than semi-monthly.

PRC employs Nelson as its Chief Financial Officer (CFO). Nelson shall perform such duties as is normally required of the CFO and such additional duties as PRC may reasonably assign from time to time.

*This contract for employment may not be terminated for any cause except only a commission of a felony or other major financial malfeasance by Nelson, and in such event, only after arbitration or litigation provides affirmation of such activity.*

In witness whereof the parties have read and executed this agreement this 30th day of June 1989.

PHOENIX RESORT
CORPORATION

By: /S/_____
    Charles H Keating, Jr.
    President

/S/_____
Larry Nelson

(Emphasis added.) One copy of this contract indicates it was acknowledged by notary Lynn L. Polkinghome on June 30, 1989.

Plaintiff served as CFO of the Phoenician until November 16, 1989, when he and several other employees of the PRC management team, including Keating, were notified by letter from Herbert Chin, an FDIC agent acting as Vice President and Treasurer of CHI and PRC, that by unanimous consent of the CHI shareholders, they had been removed from all positions with the corporation, and that employment was terminated effective immediately. Defendants admitted that an important factor in plaintiff's termination was his perceived loyalty to Keating because of a longstanding relationship as an employee of ACC and its subsidiaries since 1984.

The RTC takeover team hired security officers to supervise the takeover by accompanying those terminated employees present on the premises out of the Phoenician in the middle of the night to avoid disruption to guests and to prevent any potential sabotage of the computer system and files. A public relations team was also hired to deal with the media attention likely to be attracted by the management takeover. Several press releases were drafted to explain the takeover; among the explanations for the termination of the affected management employees were statements that they were concerned about Keating loyalists who were capable of sabotaging the plans of the new management.

Plaintiff first learned of his termination on November 16, 1989. At approximately 2:00 a.m., he received a phone call at home from the director of the resort's computer systems, advising him that FDIC officials were requesting computer passwords. Plaintiff authorized the release of the requested information and then went to the resort to assist with the management change. While in his office, plaintiff was approached by two security persons who requested that he accompany them to the lobby. When he stopped on the way at a restroom, the men followed him into the bathroom stall. After they escorted him to the lobby, he was given a termination letter, and was told to leave the resort without going back to his office to remove any personal belongings.

The media reports for the following few days had extensive news coverage of the removal of Keating and his perceived loyalists from the Phoenician, though plaintiff was not mentioned by name or shown in any of the coverage.

Plaintiff subsequently sued defendants for breach of contract, false light invasion of privacy, defamation, emotional distress, and loss of consortium. On plaintiff's motion for partial summary judgment, the trial court found that defendants had breached a valid and enforceable contract, but left the issue of damages for trial. On defendants' motion for partial summary judgment, the trial court granted summary judgment in favor of defendants on plaintiff's claims for tortious wrongful discharge, defamation, and intentional infliction of emotional distress.

After trial to a jury on the remaining claims, plaintiff was awarded $163,426.66 in lost wages and $19,608.70 for other damages on his breach of contract claim, and $358,318.05 in damages on his false light invasion of privacy claim, with punitive damages of $1,000,000, plus attorneys' fees and prejudgment interest on the liquidated contract claim. The trial court denied defendants' motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial.

Defendants timely appealed from that portion of the final judgment that incorporated summary judgment on the contract claim,

and plaintiff timely appealed from that portion of the judgment that incorporated summary judgment on his claims of wrongful discharge and intentional infliction of emotional distress.[3] The two appeals were consolidated by this court.

## DISCUSSION

### I. *Appeal: Summary Judgment on Breach of Contract Claim*

#### A. Effect of Corporate Bylaws and Shareholder Agreement on Validity of Employment Contract

Defendants first argue that the trial court should not have granted summary judgment on plaintiff's contract claim because the written employment contract violated defendants' corporate bylaws and shareholder agreement, and thus was void and unenforceable.[4]

In opposition to plaintiff's motion for partial summary judgment on the contract claim, defendants cited the following section of the CHI shareholder agreement:

4.3. The Company will not, and will not permit any subsidiary to directly or indirectly, without the approval of Shareholders holding at least three-quarters of the Shares from time to time outstanding:

. . . .

(*l*) *appoint,* remove or replace the president, treasurer, or *chief financial*

---

3. Defendants have not appealed from verdicts in plaintiff's favor on claims of false light invasion of privacy, punitive damages, attorneys' fees, and prejudgment interest.

4. Ironically, defendants' initial attempt to change the management of the subsidiaries upon the removal of Charles H Keating was unsuccessful because it did not comply with the same provisions of the shareholder agreement and bylaws that defendants now argue void plaintiff's written contract. Upon receipt of a copy of this "Written Consent of the Sole Stockholder," Benjamin W. Bull, Esquire, as corporate counsel for ACC, wrote to Mark Randall, the FDIC agent acting as conservator of Lincoln, and advised him that letters he had sent to various officers and directors of CHI and PRC purporting to exercise his right as stockholder of those corporations to

replace the current directors and officers were of "no force and effect" because they failed to comply with the bylaws of those entities and with the shareholder agreement of CHI. Bull's letter concluded that "[a]ny purported removal and replacement of directors or officers not in compliance with these documents is a nullity . . .," and that, "[u]ntil these requirements are satisfied, the persons serving as directors and officers of CHI, PRC and PCC shall continue to function in that capacity."

The record indicates that the FDIC was not able to obtain the requisite consent of the KIO, the other shareholder, until November 15, 1989, at which time CHI executed the unanimous consent that ultimately led to the planned management takeover of the Phoenician on November 16, 1989.

or accounting *officer* of the Company or any subsidiary ... or enter into, amend or terminate any agreement with any employee or consultant involving aggregate payments of more than $300,000 in any one year if, in any such case referred to in this subsection (*l*), Buyer shall have objected in writing to any such action within 10 days after written notice thereof from the Company (and the Company will not take such action without giving notice thereof to Buyer).…

(Emphasis added.) In their supplemental statement of facts in opposition to the motion for summary judgment, and in their cross-motion for summary judgment,[5] defendants also argued that the contract was unenforceable under section 1.6 of PRC's bylaws, which required "the affirmative vote of at least three-quarters of the issued and outstanding shares of common stock of the corporation" for

(*l*) appointment, *removal* or replacement *of the* president, treasurer, or *chief*

*financial* or accounting *officer* of the corporation or any subsidiary, or a general manager of the Crescent Hotel of Phoenix or the Phoenician Golf and Tennis Resort, or entrance into, amendment or termination of any agreement with any employee or consultant involving aggregate payments of more than $300,000 in any one year if, in any case referred to in this subsection (*l*), any party to the Shareholders' Agreement shall have objected in writing to any such action within 10 days after written notice therefrom from the corporation (and the corporation will not take any such action without giving advance written notice thereof to each such shareholder).…

(Emphasis added.) Defendants also pointed out that section 4.2 of the PRC bylaws required executive officers of the corporation to be elected by the board of directors.

As indicated, the trial court granted partial summary judgment on plaintiff's claim for breach of the written contract, and denied defendants' motion for reconsideration and

---

5. Although defendants refer to their Motion for Summary Judgment Against Plaintiffs Nelson as a "cross-motion" to Plaintiff's Motion for Partial Summary Judgment, in fact, defendants' "cross-motion" was filed a month after the hearing on plaintiff's motion, and was not yet at issue when the trial court entered its minute entry ruling on plaintiff's motion on June 7, 1990. Plaintiff responded to defendants' "cross-motion" on June 11, 1990, after the court had already granted summary judgment in plaintiff's favor. After a hearing on July 6, 1990, the court denied defendants' "cross-motion," three days after it had already denied defendants' Motion for Reconsideration of Order Granting Partial Summary Judgment in favor of Plaintiffs Nelson. In making its ruling, the court commented on the procedural posture as follows:

THE COURT: ... Before we address the motion, I want to address procedurally where we are. I've granted a motion for summary judgment in favor of Mr. Nelson. I've denied a motion for reconsideration. Now I have a motion for summary judgment by Phoenix Resort Corporation.

MR. CASTRO: Correct.

THE COURT: Well, what if I granted it? What would that mean?

MR. CASTRO: That would require you to reverse your prior order on your partial summary judgment.
....

THE COURT: Okay. It's ordered denying defendants' motion for summary judgment against plaintiffs Nelson on the grounds that the Court has previously granted Nelsons' motion for summary judgment against Phoenix Resort Corporation, and has denied the motion for reconsideration.

To do anything but to deny this motion for summary judgment would result in an inconsistent ruling where Nelson would have a summary judgment and so would Phoenix Resort Corporation.

*The Court also notes that the same issues were raised in this motion as were raised in opposition to the motion for summary judgment and in the motion for reconsideration.*

(Emphasis added.)

We reject defendants' contention in the briefs and in oral argument in this court that the trial court erroneously believed it lacked authority to rule on defendants' cross-motion. Rather, the record indicates that the court found no new or additional grounds raised in this motion other than those it had already ruled on, and thus denied the motion on its merits.

cross-motion for summary judgment.[6]

Subsequently, plaintiff filed a pretrial Motion in Limine re Validity of Contract, seeking to preclude defendants from introducing evidence of the above provisions of the shareholder agreement or bylaws at trial. At a hearing on that motion, the trial court indicated that, when it previously granted summary judgment on the contract claim, it did not rule whether Keating was authorized to enter the contract under the shareholder agreement, but merely ruled that the shareholders knew Keating did it, and, because they did not act one way or another, "they're stuck with it." The court noted that it never reached the issue whether the shareholder agreement was applicable, because, even if it were, defendants could not, because of their inaction, enforce the shareholder agreement or bylaws against plaintiff. The court then granted plaintiff's motion in limine.

■ The same issues involving the shareholder agreement and corporate bylaws are raised on appeal. Plaintiff first contends that these documents are not applicable because they apply only where the officer involved received "aggregate payment of more than $300,000, in any one year." Like the trial court, we reject such an interpretation; clearly, the prohibition against employment without shareholder approval refers specifically to the chief financial officer *or* employees earning more than $300,000 per year.

■ Alternatively, plaintiff defends the trial court's ruling on the basis of estoppel, because both shareholders to the PRC shareholder agreement knew that Keating had hired plaintiff as CFO and did not object to the validity of this appointment, and the corporation benefitted from his services. Defendants respond that, although the KIO may have had notice that Keating contracted with plaintiff for a two-year employment, plaintiff has not established that these defendants, as the 55% shareholder, had notice of such an employment contract, and therefore could not be estopped to raise the issue of invalidity of the contract.

First, we note that the only record reference asserted by plaintiff to show the FDIC's knowledge of plaintiff's two-year contract, as compared to the KIO's receiving a copy of the contract, is plaintiff's testimony at trial that Kathy Rubino, an employee of the FDIC, congratulated plaintiff on his two-year contract after Keating announced plaintiff's employment.

We find this evidence insufficient to impute knowledge to the FDIC as a matter of law. Moreover, this trial testimony had not been offered at the time of summary judgment. In addition, in contesting summary judgment, defendants submitted the affidavits of Mark Randall and Rubino to establish that CHI did not receive written notice of plaintiff's employment agreement prior to its execution or anytime thereafter.[7]

Defendants also argue that questions of fact exist as to plaintiff's reliance on Keating's authority to extend a two-year contract in light of the federal intervention that had previously occurred at Lincoln and other ACC subsidiaries. In response, plaintiff argues that Keating had actual or apparent authority by virtue of his executive positions at PRC, and that the contract can be enforced on any one of several theories, including estoppel, quasi-estoppel, ratification by the principal, and apparent authority of an agent. We agree that, under any of these theories, the contract might be enforceable.

---

6. Defendants filed a Motion for Entry of Partial Judgment on this issue, which the trial court granted. Defendants attempted to appeal from this order, but, because the judgment did not contain a finding of finality under Rule 54(b), Arizona Rules of Civil Procedure, this court dismissed the appeal for lack of subject matter jurisdiction. 1 CA–CV 90–0549, order filed December 7, 1990.

7. These affidavits, however, did not address whether defendants had actual knowledge of plaintiff's appointment as CFO without shareholder or director approval. Additionally, defendants do not challenge the assertion that the KIO had actual notice of plaintiff's appointment after it occurred, but failed to challenge its validity under the corporate documents. These are among the issues of fact that the parties can explore after remand.

Unfortunately, all of these theories are dependent upon factual resolutions, which the record does not reflect as capable of being resolved as a matter of law. *See Miller v. Mason–McDuffie Co.*, 153 Ariz. 585, 590–91, 739 P.2d 806, 811–12 (1987) (issues of apparent authority and reasonable reliance are jury questions); *Wagner*, 150 Ariz. at 87, 722 P.2d at 255 (question whether affirmance of unauthorized dismissal could be inferred from failure to repudiate it was a jury question); *Cook v. Great Western Bank & Trust*, 141 Ariz. 80, 85, 685 P.2d 145, 150 (App.1984) (claims of estoppel usually raise factual issues for jury).

Having reviewed the relevant summary judgment record in this case, we cannot say as a matter of law that plaintiff was entitled to summary judgment on his breach of contract claim. We therefore reverse the trial court's order granting partial summary judgment on the contract claim as well as the jury's verdict for damages on that claim, and remand this matter for further proceedings consistent with this decision.[8]

### B. Effect of Allegations of Forgery and Perjury

Because we remand this matter for determination by a factfinder of the breach of contract claim, we need not determine in this appeal whether denial of defendants' motion for a new trial was warranted on the basis of defendants' allegations of forgery and perjury when the validity of the contract was not at issue at that trial. However, because these allegations may arise again in the context of a trial on the contract claim, we point out that the trial court's ruling on this issue at the time it was made was warranted by the following evidence: (1) defendants conceded on the record that they had no evi-

dence that plaintiff participated in a forgery of Keating's signature on his employment contract; (2) Keating's affidavit established that he signed the document in question; (3) two additional signed contracts exist in this record that have not been challenged as forgeries; one was offered by defendants themselves in support of their response to plaintiff's motion for summary judgment; and (4) the notary's affidavit does not indicate that she participated in or had knowledge of a forgery by plaintiff or anyone else. However, we do not rule on the admissibility or relevance of any forgery evidence at a new trial.

### II. Cross–Appeal: Summary Judgment on Tort Claims

#### A. Wrongful Discharge/Bad Faith Claim

Plaintiff's First Amended Complaint alleged that plaintiff "was terminated without cause or justification in violation and breach of his employment agreements with [defendants]," and that such termination "was unreasonable, tortious and in bad faith." Defendants moved for summary judgment on plaintiff's tort claims,[9] contending that no "general" tort claim for wrongful discharge was available to plaintiff because no tort claim for breach of good faith and fair dealing is cognizable in Arizona outside of the insurance context unless it involves a violation of public policy, which had not been alleged in this case. *See Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 710 P.2d 1025 (1985).[10] Plaintiff responded that he had asserted a claim for "tortious breach" of the employment contract, based on a "special relationship," by which he could recover damages beyond those available for breach of contract, including plaintiff's loss of

---

8. Our reversal of summary judgment on the contract claim also vacates the award of attorneys' fees, costs, and prejudgment interest on the contract claim.

9. Defendants also moved for summary judgment on plaintiff's additional contract claim based on oral modifications to the written contract. Because plaintiff subsequently withdrew his claim

for extended contract damages based on oral promises, that claim is not relevant to this appeal.

10. Alternatively, defendants argued that no bad faith was involved in plaintiff's termination. We do not address this issue.

reputation from being fired and loss of skills he could have gained from his two-year employment with the resort. The trial court granted summary judgment to defendants on this claim, finding that Arizona courts have not recognized a claim in tort arising from breach of a contract unless public policy is violated by the breach.

On cross-appeal, plaintiff contends that this ruling was in error because "Arizona employment law demonstrates the basis for a tort remedy in wrongful discharge cases."

Plaintiff's explanation of the tortious conduct by defendants in this case is that they "not only failed to take special care in the manner in which they terminated Nelson, they acted in a blatantly outrageous manner" by staging a "media event" that harmed plaintiff's reputation. Plaintiff also contends that the reason for plaintiff's termination— "his perceived close relationship with Keating, whom defendants viewed with extreme animosity"—constituted "bad cause" for which a tort remedy is available. Although plaintiff concedes that "any employer has the right to breach even a written contract" and thus subject itself to liability for contract damages, "[w]hen the breach is accomplished, however, in a way that deprives the employee of other specific benefits of the agreement, tort damages will lie." For this proposition, plaintiff relies on *Wagenseller*.

We do not read Arizona case law regarding tortious wrongful discharge quite as broadly as plaintiff construes it. First, as defendants correctly point out, the *Wagenseller* court did not recognize a "general" tort claim based on bad faith employment termination cases. Rather, the supreme court recognized three exceptions to the general at-will employment doctrine: (1) the public policy exception; (2) the personnel policy manual exception; and (3) the good faith and fair dealing exception. *Id.* at 376–86, 710 P.2d at 1031–41. Because plaintiff has not identified a public policy that was violated by his termination, and has

abandoned his argument regarding modification of the contract by defendants' adoption of company termination procedures, we address only the good faith and fair dealing exception in this case.

The *Wagenseller* court acknowledged that every contract, including employment contracts, contains an implied-in-law covenant of good faith and fair dealing that requires "neither party do anything that will injure the right of the other to receive the benefits of their agreement." *Id.* at 383, 710 P.2d at 1038. However, the remedy for a breach of the covenant of good faith "generally is on the contract itself." *Id.* In this case, the trial court allowed the jury to consider any damages that might flow from the contract itself. Plaintiff's argument that breach of his employment contract prior to termination deprived him of other benefits of his agreement was answered in *Lindsey v. University of Arizona*, 157 Ariz. 48, 53, 754 P.2d 1152, 1157 (App.1987). The *Lindsey* court held that, where an employee's termination does not violate public policy, the mere fact of termination before the term of employment is completed does not entitle the employee to maintain actions for both breach of contract and breach of the implied covenant of good faith because, in any event, damages for both claims would be the same.

Plaintiff claims, however, more than just the contract remedy in this case. He also claims damages to his reputation from the manner in which the termination was conducted and the loss of the other benefits from his contract, including a sense of security and the skills he would have obtained from two years experience in the hotel industry.[11] We disagree that these damages are recoverable through a theory of tortious breach of the covenant of good faith and fair dealing in Arizona. The cause of action for "bad faith" employment termination that plaintiff asks us to recognize in this case simply does not exist under Arizona law.

In *Wagenseller*, our supreme court explicitly refused to extend the bad faith recovery

---

11. We note that any monetary damages for the injury to plaintiff's reputation arising out of the manner in which termination was conducted were included in the award of $358,318.05 for plaintiff's false light invasion of privacy claim.

available in actions on insurance contracts to the employment contract context. *Cf. Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981). The court reasoned:

> Were we to adopt such a rule, we fear that we would tread perilously close to abolishing completely the at-will doctrine and establishing by judicial fiat the benefits which employees can and should get *only* through collective bargaining agreements or tenure provisions....
>
> \*   \*   \*   \*   \*   \*
>
> Thus, because we are concerned not to place undue restrictions on the employer's discretion in managing his workforce and because tenure is contrary to the bargain in an at-will contract, we reject the argument that a no cause termination breaches the implied covenant of good faith and fair dealing in an employment-at-will relationship.

*Wagenseller*, 147 Ariz. at 385–86, 710 P.2d at 1040–41.

Every court that has considered *Wagenseller* has construed its holding to prohibit a tortious "bad faith" cause of action from arising out of breach of an employment agreement when no public policy is violated, whether the employee was "at-will" or tenured by contract. *See Woerth v. City of Flagstaff*, 167 Ariz. 412, 417–18 n. 7, 808 P.2d 297, 302–03 n. 7 (App.1990) ("Although Woerth refers to his claim for breach of the covenant of good faith and fair dealing as a claim sounding in tort, Arizona has consistently refused to recognize a tort action for breach of the implied covenant in the employment contract context," citing *Wagenseller*); *Lindsey*, 157 Ariz. at 53, 754 P.2d at 1157 (fact that an employee is terminated before full term of employment expires does not give rise to a bad faith action, citing *Wagenseller*); *Norman v. Recreation Centers of Sun City, Inc.*, 156 Ariz. 425, 429, 752 P.2d 514, 518 (App.1988) (citing *Wagenseller*, concluding, "our supreme court declined to adopt this [good faith and fair dealing] excep-

tion"); *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 626, 778 P.2d 744, 748 (1989) (quoting *Wagenseller* to adopt the covenant of good faith and fair dealing as implied-in-law in every contract, but noting that breach of the covenant results in contract damages, not tort damages, and concluding that *Wagenseller* "rejected a rule which would allow tort damages"); *Noye v. Hoffmann–La Roche Inc.*, 238 N.J.Super. 430, 570 A.2d 12, 14 (1990) (citing *Wagenseller* as accepting "the view that an implied covenant of good faith and fair dealing exists in employment contracts, but ... refused to permit tort damages"); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 235, 765 P.2d 373, 397 (1988) (citing *Wagenseller* for the proposition that extension of bad faith tort claims to the employment context "is better suited for legislative decisionmaking").

Plaintiff asks us in this case to extend the tortious cause of action for insurance bad faith claims to employment discharge claims because of the analogous "special relationship" between employer and employee and similar disparity of bargaining power in contracting for insurance and employment contracts. We note that such an approach has been soundly rejected by other courts and commentators for extensively analyzed reasons that need not be repeated at length here. *See, e.g., Foley*, 254 Cal.Rptr. at 232–34, 765 P.2d at 394–96 and authorities cited therein. We are unpersuaded that this case presents us with such distinguishable facts that we could depart from the *Wagenseller* rules.

■ Based on the foregoing, in the context of this case, we hold that plaintiff's remedy for a breach of the implied covenant of good faith and fair dealing implied in his employment contract was limited to those damages he claimed for breach of that contract. Thus, we find no error in the trial court's granting of summary judgment on any additional claim for "tortious" breach of contract.

## B. Intentional Infliction of Emotional Distress Claim

Defendants also moved for summary judgment on plaintiff's claim for intentional inflic-

tion of emotional distress, arguing that the complaint failed to allege conduct by defendants that caused him distress. Defendants contended that plaintiff's only explanation of the tortious conduct alleged to support this claim was the manner in which he was fired, as described in his deposition:

I could try to explain to you in words, but I don't know if you have the reference point to understand what I'm talking about. I don't know if you've ever—I don't know if you're married, I don't know if you have three little children, I don't know if you are expecting a child.

I don't know if you've ever been fired. I don't know if you've ever gone to work at 3:00 in the morning and subsequently had people with guns march into your office, pull you upstairs to the lobby of the place where you work and fire you in front of the news media that they invited down to watch.

Defendants argued that this allegation was insufficient to meet the elements of a claim for intentional infliction of emotional distress. In response, plaintiff contended that the consolidated statement of facts containing a recitation of the manner by which plaintiff was fired was sufficient to state such a claim. Plaintiff specifically referred to paragraphs 66 through 69 of the consolidated statement of facts, and invited the court to view the videotape of news coverage of the takeover of the Phoenician that was included as exhibit.[12]

At the hearing on the motion, the trial court ascertained that the factual basis for the claim was the method by which plaintiff was terminated and found that the termination conduct did not rise to the level necessary to sustain a claim for intentional infliction of emotional distress.

■ On appeal, the parties agree regarding the relevant elements to establish a claim for intentional infliction of emotional distress in Arizona. To prevail, plaintiff must show:

(1) that defendants' conduct could be characterized as "extreme and outrageous";

(2) that defendants either intended to cause or recklessly disregarded the near certainty that emotional distress would result from their conduct;

(3) that defendants' conduct actually caused severe emotional distress.

*Lucchesi v. Frederic N. Stimmell, M.D., Ltd.,* 149 Ariz. 76, 78–79, 716 P.2d 1013, 1015–16 (1986). Even if the second and third elements are present, the trial court must, on the first element, make a preliminary determination whether the conduct may be considered so outrageous and extreme so as to permit recovery. *Cluff v. Farmers Ins. Exch.,* 10 Ariz.App. 560, 562, 460 P.2d 666, 668 (1969); *see also Restatement (Second) of Torts* § 46. That issue may only go to the jury where "reasonable minds may differ." *Restatement, supra.* Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of "atrocious" and "beyond all possible bounds of decency" that would cause an average member of the community to believe it was "outrageous." *Ford v. Revlon, Inc.,* 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987); *Lucchesi,* 149 Ariz. at 78, 716 P.2d at 1015; *see also Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 619 P.2d 1032 (1980) (unjustifiable delay in failing to notify wife of husband's terminal illness was not outrageous); *Duhammel v. Star,* 133 Ariz. 558, 653 P.2d 15 (App.1982) (false accusations against police officer not outrageous conduct justifying claim for emotional distress).

■ We have reviewed the evidence and allegations concerning the manner in which plaintiff was terminated from employment. We agree with defendants and the trial court that plaintiff did not provide evidence of out-

12. Paragraphs 66 through 69 of the Consolidated Statement of Facts contain a description of the method by which plaintiff was terminated, from quoted deposition testimony. The videotape contains excerpts of all television news broadcasts in Phoenix over several days regarding the takeover of the Phoenician and Crescent hotels. Plaintiff does not appear, nor is he mentioned by name, anywhere on the videotape.

rageous and extreme conduct sufficient to survive a motion for summary judgment. Other courts too have concluded that similar circumstances surrounding an employer's method of discharging an employee, whether wrongful or not, simply did not rise to a level of conduct extreme enough to establish such a claim. *See, e.g., Lapidus v. New York City Chapter of the New York State Ass'n for Retarded Children, Inc.,* 118 A.D.2d 122, 504 N.Y.S.2d 629, 633 (1986) (plaintiff's "humiliation" at being "thrown out in the middle of a working day and told not to go back to [his] office," coupled with information rapidly spread among his peers about what was done to him, with resulting mental depression and shock, not sufficient to state a claim for intentional infliction of emotional distress).

■ We also reject plaintiff's argument that the trial court's finding of an inadequate basis for the emotional distress claim is inconsistent with the jury's award of punitive damages on the false light claim. The award of punitive damages was not appealed and therefore we have no basis for assessing whether the evidence presented to the jury makes its finding inconsistent with a finding that emotional distress is not present here.

Based on the record before us, we hold that the trial court was justified in granting defendants' motion for summary judgment on plaintiff's claim for intentional infliction of emotional distress.

### *Attorneys' Fees*

In their reply brief, defendants request an award of attorneys' fees, without specifying a statutory basis. At oral argument, defendants sought an award of fees pursuant to A.R.S. §§ 12–349 and 12–341.01(A).

We do not find entitlement to fees in this case on the basis of § 12–349 because we do not find the cross-appeal was brought without substantial justification or for purposes of delay or harassment.

■ Whether defendants have been "the successful party" in an action "arising out of contract" within the meaning of A.R.S. § 12–341.01(A) poses a more difficult question that has not been briefed in this case. Although defendants have been granted the alternative relief of a new trial that they requested on appeal, it remains to be seen whether they will prevail on the breach of contract claim at trial. In *Wagenseller,* our supreme court rendered the following interpretation of "successful party" on appeal within the meaning of A.R.S. § 12–341.01(A):

We believe that under A.R.S. § 12–341.01 "successful party" on appeal is not limited to those who have a favorable final judgment at the conclusion of the appeal process. It may include those who achieve reversal of an unfavorable interim order if that order is central to the case and if the appeal process finally determines an issue of law sufficiently significant that the appeal may be considered as a separate unit.

147 Ariz. at 393–94, 710 P.2d at 1048–49; *see also Barmat v. John & Jane Doe Partners A–D,* 155 Ariz. 519, 521, 747 P.2d 1218, 1220 (1987) (interim award of fees on appeal resulting in reversal of summary judgment and remand for new trial was proper where appellants' "legal position was meritorious and the issue resolved was central to the case"). Unlike *Wagenseller,* in which "the successful party" not only achieved a reversal of a summary judgment but also established a significant issue of law involving tort liability for bad cause termination of employment at-will, this case involves only the determination that summary judgment was not proper because of disputed issues of material fact. Whether defendants will ultimately prevail on the contract claim is yet to be determined, and defendants have not obtained a decision on any significant issue of law. Under these circumstances, in the exercise of our discretion, we decline to award attorneys' fees on appeal at this time. However, if defendants should ultimately prevail on retrial, the trial court can properly consider attorneys' fees incurred on appeal in relation to the contract claim. Conversely, if plaintiff is ultimately successful on retrial, to assure that plaintiff does not obtain a fee award for appellate

work on issues that defendants won on appeal, the trial court is instructed to exclude such fees from plaintiff's fee award.

Defendants also prevailed on the cross-appeal in this case, in which plaintiff asserted two tort claims. At oral argument, defendants contended that the cross-appeal issues arose out of contract, without making a distinction between the two claims involved.

Attorneys' fees may be awarded on the basis of A.R.S. § 12–341.01(A) "based upon facts which show a breach of contract, the breach of which may also constitute a tort." *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 543, 647 P.2d 1127, 1141, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). In *Sparks,* our supreme court concluded that a tort claim for insurance bad faith "could not exist *but for* the breach of the contract," for the following reason:

> Clearly, the tort of bad faith cannot be committed absent the existence of an insurance contract and a breach thereof. Because the existence of the tort is so intrinsically related to the contract, we conclude than an action alleging insurer's bad faith is one "arising out of contract...."

*Id.* 132 Ariz. at 543–44, 647 P.2d at 1141–42. The court also concluded, however, that no fees should be awarded for the claim for misrepresentation, because such an action "sounds mainly in tort and its existence does not depend upon a breach of the contract of insurance." *Id.* at 544, 647 P.2d at 1142. The court clarified this distinction in *Barmat,* pointing out that, when a duty of good faith would not otherwise exist between the parties in the absence of the contract, then a tort bad faith claim "arises out of a contract." *Barmat,* 155 Ariz. at 522, 747 P.2d at 1221. On the other hand, where the duty alleged to have been breached arises outside of the contract, for example, as a result of public policy or common law that implies a duty among those with special relationships, then the action sounds in tort, and the successful party is not eligible for an award of fees under the statute. *Id.* at 522–23, 747 P.2d at 1221–22.

In cases in which the action on appeal is based a breach of the covenant of good faith and fair dealing that is implied in a written contract, Arizona courts have consistently found the successful party eligible for an award of attorneys' fees under A.R.S. § 12–341.01(A). *See Burkons v. Ticor Title Ins. Co.,* 165 Ariz. 299, 798 P.2d 1308 (App. 1989) (because escrow agent owes no fiduciary duty in absence of contract, bad faith claim arose out of contract); *Sparks,* 132 Ariz. at 543, 647 P.2d at 1141 (no duty would exist between insurer and insured but for the promises in the contract). On the other hand, when the duty alleged to be breached arises whether or not the contract exists, the action arises in tort and the successful party may not claim fees under A.R.S. § 12–341.01. *See Lohse v. Faultner,* 176 Ariz. 253, 264, 860 P.2d 1306, 1317 (App.1992) (contractual safety responsibilities were not essential to plaintiff's tort claim to take reasonable precautions against fire); *Barmat,* 155 Ariz. at 523, 747 P.2d at 1222 (professional malpractice based on duties implied by law by special relationship arises in tort, not contract); *Sparks,* 132 Ariz. at 544, 647 P.2d at 1142 (action for misrepresentation did not arise from contact because claim does not depend on existence of contract of insurance).

Applying these principles to this case, we conclude that plaintiff's claim for tort recovery on cross-appeal for breach of the covenant of good faith and fair dealing arose from contract, because the tort claim for bad faith could not have been alleged in the absence of an employment contract. On the other hand, plaintiff's claim for tort recovery on cross-appeal for intentional infliction of emotional distress was not a claim that relied on the existence of a contract between the parties; thus, it arises in tort, not contract, and attorneys' fees are not available under A.R.S. § 12–341.01(A) for that portion of the cross-appeal.

Because the issues raised by the cross-appeal are now terminated, we award defen-

dants their attorneys' fees on cross-appeal for their defense of the bad faith issue, but not for their defense of the emotional distress issue. Defendants are directed to comply with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

## CONCLUSION

On the appeal, we reverse the trial court's order granting summary judgment to plaintiff on the breach of contract claim, and we vacate the jury's award of damages, attorneys' fees, costs, and prejudgment interest on that claim. The breach of contract claim is remanded for trial.

On the cross-appeal, we affirm the trial court's order granting summary judgment to defendants on the claims of tortious breach of the covenant of good faith and fair dealing and intentional infliction of emotional distress.

We award defendants their attorneys' fees on the cross-appeal claim of tortious breach of the covenant of good faith and fair dealing. However, we deny attorneys' fees on the cross-appeal claim of intentional infliction of emotional distress, as that claim did not arise out of contract. We also leave to the trial court the assessment of defendants' attorneys' fees on appeal incurred in connection with the reversal of the contract summary judgment.

Reversed and remanded on appeal; affirmed on cross-appeal.

NOYES and FIDEL, JJ., concur.