NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

APPLIED MERCHANT SYSTEMS WEST COAST LLC, *Plaintiff/Appellee*,

*v.*

DISCOUNT PAYMENT SERVICES LLC, et al., *Defendants/Appellants*.

No. 1 CA-CV 20-0031
FILED 1-12-2021

---

Appeal from the Superior Court in Maricopa County
No. CV2019-000922
The Honorable Timothy J. Thomason, Judge

**AFFIRMED**

---

COUNSEL

DLA Piper LLP (US), Phoenix
By Craig M. Waugh
*Counsel for Plaintiff/Appellee*

Alexander R. Arpad Esq., Phoenix
By Alexander R. Arpad

Covault Law, Phoenix
By Jason Covault

The Hallstrom Law Firm, PLLC, Phoenix
By Kyle Hallstrom
*Co-Counsel for Defendants/Appellants Discount Payment Services, LLC and
Marshall Greenwald*

Honor Law Group PLLC, Tempe
By James M. Cool
*Counsel for Defendant/Appellant Aimee Greenwald*

---

**MEMORANDUM DECISION**

Chief Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge Lawrence F. Winthrop joined.

---

**S W A N N**, Chief Judge:

¶1            Appellants Discount Payment Services, LLC ("Discount") and Aimee Greenwald challenge the superior court's grant of summary judgment to Appellee Applied Merchant Systems West Coast, LLC ("Applied").  For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2            Discount sells credit card processing solutions to businesses. Each business account generates processing fees that merchants pay to Discount's processing servicer, Paya, who pays residuals to Discount each month based on the amount of fees collected.

¶3            On November 15, 2013, Discount borrowed $475,000 from Applied's predecessor-in-interest, BlueAcre Ventures LLC ("BlueAcre"), under a Secured Residual Loan Agreement (the "Loan Agreement"). Discount granted BlueAcre a security interest in its agreements with Paya and assigned the residuals it received from those agreements "to allow for all the Residuals to be paid directly to [BlueAcre] to satisfy [Discount's] Loan Obligations."  Discount, BlueAcre, and Paya also executed an Authorization to Pay Residuals (the "Authorization") under which Discount collaterally assigned "all of [its] Residuals due and payable" from Paya and authorized Paya "to make payments of the Assigned Residuals directly to [BlueAcre]."  Discount and BlueAcre also executed an Option Agreement granting BlueAcre an option to identify and purchase certain accounts from Discount's portfolio that, when combined, would average $18,581.79 of residuals per calendar month, matching Discount's monthly payment on the BlueAcre loan (the "Option Agreement").

2

¶4        Section 1.02 of the Option Agreement provided the method by which BlueAcre could exercise its option:

> The Option may be exercised by the Company [BlueAcre] delivering a notice of intent to exercise to owner [Discount] (a) no later than thirty (30) calendar days after the Owner pays the Loan in full (as determined by Company in Company's sole discretion); or (b) subject to Owner's right to cure under the Loan Agreement, upon any material breach by Owner of the Loan Agreement or any other Loan Document between Owner and Company (as such breach is determined by Company in Company's reasonable discretion) and at any time following such breach. Such notice shall identify this Agreement and shall be sent to Owner at the addresses set forth in Section 2.06. Within a reasonable period of time thereafter not to exceed forty-five (45) days (subject to Section 1.06 of this Agreement), Owner and Company shall execute and enter into a portfolio purchase agreement for the Purchased Merchants in substantially the form attached hereto as <u>Exhibit A</u> (the "Portfolio Purchase Agreement").

¶5        On July 12, 2016, Discount and BlueAcre entered a Supplemental Agreement to the Option Agreement ("Supplemental Agreement"). There, the parties agreed to reduce BlueAcre's purchase price under the option from $90,000 to $72,000 if paid by the next day, which BlueAcre did. The parties also agreed that BlueAcre had given notice of its intent to exercise its option:

> By executing this Agreement and delivering said reduced purchase price to Owner [Discount], Owner hereby acknowledges that the notice of intent to exercise of the option granted under the Option Agreement has been given by Company [BlueAcre] to Owner as required under the Option Agreement.

The Supplemental Agreement also provided that the parties would "enter into a portfolio purchase agreement . . . within thirty (30) calendar days after payment in full of the Loan . . . as required by the Loan Agreement" but left all other Loan Agreement and Option Agreement terms unchanged. BlueAcre assigned its interests under the agreements to Applied in a Consent to Assignment Agreement ("Consent to Assignment") executed by BlueAcre, Applied, Discount, and Paya's predecessor.

**¶6** Discount fully repaid the BlueAcre loan on or about November 15, 2016. Applied provided Discount with its selection of accounts on December 22, 2016, six days after the deadline to do so under the Supplemental Agreement. At Discount's request, Applied made revised selections on or about January 10, 2017, and Discount asked that the list "be attached as an Exhibit to the Portfolio Purchase Agreement. The parties did not, however, execute a Portfolio Purchase Agreement" (referred to hereinafter as "PPA").

**¶7** Paya paid the November 2016, December 2016, and January 2017 residuals to Applied. Discount wrote to Applied on January 18, 2017, contending the sale could not close without a PPA but that it remained willing to execute a PPA if Applied remitted these residuals. Applied did not turn over the residuals; it instead sent Discount a revised draft PPA under which it would keep all funds it had retained from when it paid the reduced purchase price in July 2016. Discount did not sign the revised draft.

**¶8** Applied sued Discount in January 2019, alleging Discount had wrongly instructed Paya to direct March 2018 and April 2018 residuals to itself.[1] On cross-motions for summary judgment, the superior court ruled Applied had properly exercised its option by "[p]roviding the notice of intent to exercise," at which point "[a] bilateral contract was created." It further determined that "[t]he language about signing the [PPA] is in a later clause that does not describe the actual exercise of the option" and that the parties' failure to execute any such agreement did not give Discount the right to terminate the option. The court ordered Discount "to execute a [PPA] evidencing Applied's purchase and Discount's sale of the residual rights" associated with the accounts identified on January 10, 2017. The court also directed Paya to pay residuals it had held pending resolution of the dispute on a stipulated list of accounts to Applied and pay all other held residuals to Discount.

**¶9** Discount appeals.

## DISCUSSION

**¶10** We review the superior court's interpretation of the parties' contracts de novo. *Dunn v. Fast Med. Urgent Care PC*, 245 Ariz. 35, 38, ¶ 10 (App. 2018). Regarding the rulings on cross-motions for summary

---

[1] Applied also sued on a second option that is not at issue in this appeal.

judgment, we review questions of law de novo but review the facts in a light most favorable to the parties against whom summary judgment was granted. *Nelson v. Phx. Resort Corp.*, 181 Ariz. 188, 191 (App. 1994). The court may grant summary judgment only if it finds there are no genuine issues of material fact and that one party is entitled to judgment as a matter of law. *Grain Dealers Mut. Ins. Co. v. James*, 118 Ariz. 116, 118 (1978). Summary judgment is inappropriate if the facts, even if undisputed, would allow reasonable minds to differ on the appropriate legal result. *Nelson*, 181 Ariz. at 191.

## I. APPLIED PROPERLY EXERCISED THE OPTION.

**¶11** Discount contends Applied did not properly exercise the option, arguing it only could be exercised by (1) delivering notice of the intent to exercise and (2) entering a PPA. An option must be exercised in strict compliance with its terms and conditions. *Best v. Miranda*, 229 Ariz. 246, 248, ¶ 7 (App. 2012).

**¶12** Section 1.02 of the option states that it "may be exercised by . . . delivering a notice of intent to exercise" to Discount, which the parties agreed took place. But the obligation to "execute and enter into a [PPA]" comes "[w]ithin a reasonable period of time thereafter not to exceed forty-five (45) days" and the responsibility to execute the PPA falls on both parties, not just Applied. Section 1.02 also references section 1.06, which provides:

> If [Discount] the Owner and [BlueAcre] Company fail to enter into the [PPA] within forty-five (45) days after Company delivers a notice of intent to exercise . . . then, upon Company request, the Owner will pay to Company . . . a termination fee in an amount equal to $50,000.00.

And section 1.05 allows Applied to request "such further instruments as [it] may reasonably require in order to confirm . . . the rights, licenses, privileges and property which are the subject of the Option." Indeed, no part of the option suggests that exercise of the option becomes invalid or incomplete if the parties do not timely execute a PPA. Applied therefore did not have to complete a PPA to exercise its option.

**¶13** Discount also contends Applied had to identify the specific accounts it would purchase before executing a PPA, citing section 1.04 of the Option Agreement. Applied did so on December 22, 2016, and January 10, 2017. Discount accepted the latter selections, thereby waiving any objection to their timeliness under the Supplemental Agreement. And

Discount does not challenge the court's finding that "when Applied elected the purchased accounts, it accounted for and paid [Discount] for all Residuals other than those generated by accounts actually purchased."

**¶14**　　Discount also contends Applied could not own the purchased *accounts* until a PPA was in place, again citing section 1.04 of the Option Agreement:

> Upon the execution of the [PPA] and payment of the purchase price thereunder, the Purchased Merchants, which shall be jointly identified by Owner and the Company (subject to Company's final selection) shall be owned by the Company.

Even assuming this is correct, Discount had already assigned its right to receive the *residuals*. The Loan Agreement authorized "residual redirection or assignment" with Applied taking monthly loan payments "upon receipt of Residuals and pay[ing] any balance remaining to [Discount]," defining "Residuals" as "payments and rights to payments," not accounts. And the Authorization documents Discount's assignment of "all of [its] Residuals due and payable . . . from [Paya]" so that Paya could "make payments . . . directly to [BlueAcre]."

**¶15**　　The Loan Agreement also obligated Applied, if it exercised the option, to "take all necessary actions to assign the non-purchased Residuals . . . back to [Discount]" once the loan was paid in full. The parties did not agree on which accounts Applied would purchase until January 2017, and Discount does not challenge the court's finding that Applied subsequently paid Discount for all residuals other than those generated by those accounts.

II.　　APPLIED DID NOT BREACH OR REPUDIATE THE PARTIES' CONTRACTS BY RETAINING THE NOVEMBER 2016 THROUGH JANUARY 2017 RESIDUALS.

**¶16**　　Discount's contention that Applied breached or repudiated the parties' agreements by retaining the November 2016, December 2016, and January 2017 residuals fails for the same reason. Discount again argues Applied never took ownership of the accounts because there is no PPA, but as previously noted, Applied retained the residuals, not accounts.

**¶17**　　Discount also cites section 3.1(a) of the Loan Agreement, which gave it the right to receive residuals in the time between "the payment in full of the Loan" and "the date that said Residuals are assigned back to Borrower or purchased by Lender pursuant to the Option

Agreement." That section also requires, as quoted above, that Applied take any necessary steps to assign non-purchased residuals and merchant agreements back to Discount if it exercised the option. This requirement would be meaningless if Discount would have been entitled to receive all residuals upon repaying the remaining balance of the loan. Again, it is undisputed that Applied paid Discount the residuals for accounts it did not select under the Option Agreement in January 2017.

¶18 The Option Agreement calls for specific performance "of the terms hereof and the [PPA]" if it is breached. We therefore affirm the superior court's order directing the parties to execute a PPA evincing Applied's purchase of the accounts identified in the court's amended judgment.

III. ATTORNEY FEES AND COSTS ON APPEAL.

¶19 Both parties request their attorney fees and costs incurred in this appeal under the Option Agreement:

> Should suit or arbitration be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, including expert witness fees and fees on any appeal.

Generally, we enforce a contractual attorney's fees provision according to its terms. *Harle v. Williams*, 246 Ariz. 330, 333, ¶ 10 (App. 2019). Applied is the prevailing party in this appeal and may recover its reasonable attorney's fees and taxable costs upon compliance with ARCAP 21.

**CONCLUSION**

¶20 We affirm the judgment.



AMY M. WOOD • Clerk of the Court
FILED:   AA